Filed 4/19/21  P. v. Namauu CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046070 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. Nos. F28398, F28401) |
| v. | |
| JONAH KALEIKAUMAKA NAMAUU et al., | |
| Defendants and Appellants. | |

Appellants Jonah Kaleikaumaka Namauu and Brandon Aaron Thomas appeal from judgments entered after a jury found them guilty of first degree murder with a special circumstance and other crimes related to a shooting in which Namauu fired a gun from Thomas's car into another car with two occupants, killing the driver.

Between their two appeals, Namauu and Thomas raise multiple claims of error. Stated broadly, they separately or jointly challenge the trial court's admission or exclusion of certain evidence, the trial court's denial of Thomas's suppression motion, the sufficiency of the evidence regarding their participation in a criminal street gang, and certain aspects of their sentences, including the fines and fees imposed on them.

For Namauu, we vacate his sentence and remand his case to allow the trial court to exercise its discretion whether to strike Namauu's prior serious felony enhancement.  We also direct the trial court to strike Namauu's prior prison term enhancement and to state a

disposition for certain firearm enhancements found true by the jury. We otherwise reject Namauu's claims of error and affirm his convictions and sentence.

For Thomas, we find no error and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

In May 2018, the Santa Cruz County District Attorney filed a first amended information (information) charging Namauu with seven counts; in June 2018, the district attorney filed a second amended information charging Thomas with six counts (collectively, informations). The charged crimes related to a deadly shooting that occurred on April 3, 2015.

Count 1 in both informations alleged murder (Pen. Code, § 187, subd. (a)[1]) with two special circumstances (§ 190.2, subds. (a)(21) [intentional murder by discharging a firearm from a motor vehicle (drive-by special circumstance)], (a)(22) [intentional murder for a criminal street gang (gang special circumstance)]), gang enhancements (§ 186.22, subds. (b)(1), (b)(5)), and an enhancement for the personal use of a firearm (§ 12022.53, subds. (b)–(e)(1)). For Namauu, count 1 also alleged an enhancement for the personal use of a firearm (§ 12022.5, subd. (a)). For Thomas, count 1 also alleged an enhancement for being armed with a firearm (§ 12022, subd. (a)(1)).

Count 2 in both informations alleged shooting at an occupied motor vehicle (§ 246) with gang enhancements (§ 186.22, subds. (b)(1), (b)(4)) and an enhancement for the personal use of a firearm (§ 12022.53, subds. (b)–(e)(1)).

Count 3 in both informations alleged shooting from a motor vehicle (§ 26100, subd. (d)) with a gang enhancement (§ 186.22, subd. (b)(1)) and an enhancement for the personal use of a firearm (§ 12022.53, subds. (b)–(e)(1)).

---

[1] Unspecified statutory references are to the Penal Code.

Count 4 against Thomas alleged permitting another to shoot from a vehicle (§ 26100, subd. (b)) with a gang enhancement (§ 186.22, subds. (b)(1)).

Count 4 against Namauu and count 5 against Thomas alleged assault with a firearm (§ 245, subd. (a)(2)) with a gang enhancement (§ 186.22, subd. (b)(1)). For Namauu, count 4 also alleged an enhancement for the personal use of a firearm (§ 12022.5, subds. (a), (d)).

Count 5 against Namauu and count 6 against Thomas alleged participation in a criminal street gang (§ 186.22, subd. (a)).

Count 6 against Namauu alleged possession of a firearm by a felon (§ 29800, subd. (a)(1)) with a gang enhancement (§ 186.22, subds. (b)(1)).

Count 7 against Namauu alleged possession of ammunition by a prohibited person (§ 30305, subd. (a)(1)) with a gang enhancement (§ 186.22, subd. (b)(1)).[2]

The information against Namauu further alleged he had a prior serious felony conviction (§ 667, subd. (a)(1)), a prior strike conviction (§ 667, subds. (b)–(i)[3]), and a prior prison term for a felony conviction under section 245, subdivision (a)(2) (§ 667.5, subd. (b)).

Namauu and Thomas were tried jointly between late April 2018 and early July 2018. On July 3, 2018, the jury found Namauu and Thomas guilty on all counts.[4] For

---

[2] The gang enhancements for counts 6 and 7 against Namauu were not ultimately submitted to the jury for a verdict.

[3] The first amended information against Namauu, apparently in error, asserted this allegation arose under section *667.5*, subdivisions (b)–(i), rather than section 667, subdivisions (b)–(i). (Italics added.) However, the original information charging Namauu correctly stated this allegation under section 667, subdivisions (b)–(i). The parties and the trial court appear to have proceeded under the assumption that the allegation fell under section 667 rather than section 667.5. Neither Namauu nor the Attorney General has raised any issue on appeal with respect to the first amended information.

[4] The minute order documenting the jury's verdicts for Namauu does not include all the verdicts returned on count 1. Further, no verdicts for counts 2 and 3 are included

Namauu, the jury found the murder in count 1 to be in the first degree and found true the drive-by special circumstance. However, the jury found not true the gang special circumstance and all the gang enhancements submitted for a verdict under section 186.22, subdivision (b). Further, the jury found true all the firearm enhancements under sections 12022.5 and 12022.53, attendant to counts 1, 2, 3, and 4 against Namauu.[5]

For Thomas, the jury similarly found the murder in count 1 to be in the first degree and found true the drive-by special circumstance. The jury found not true the gang special circumstance in count 1. The jury also found not true all of the gang and firearm enhancements in counts 1–5, except for the firearm enhancement in count 1 under section 12022, subdivision (a)(1), which the jury left "Blank" on its verdict.[6]

Namauu waived his right to a jury trial on the allegations related to his prior convictions. Thereafter, the trial court found true the allegations regarding Namauu's prior conviction for a serious felony (§ 667, subd. (a)(1)), prior strike conviction (§ 667, subds. (b)–(i)), and prior prison term (§ 667.5, subd. (b)).

On August 7, 2018, the trial court sentenced Namauu to an aggregate term of 23 years plus life without the possibility of parole. The trial court imposed and struck the punishments for the firearm enhancements alleged against Namauu in counts 1, 2, and 3

---

in the minute order. In our disposition, we order the trial court to correct this error. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 386; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

[5] The jury's verdict on count 2 against Namauu included a firearm enhancement under section 12022.5, subdivision (a). However, the information did not allege a firearm enhancement in count 2 under section 12022.5; the firearm allegation for that count arose under section 12022.53. Neither Namauu nor the Attorney General has raised any issue on appeal with respect to the information and verdict on count 2. In addition, we note the jury did not find true any of the firearm enhancements alleged in the information against Namauu under section 12022.53, subdivisions (e)(1). Rather, the jury's true findings were returned under section 12022.53, subdivisions (b), (c), and (d). Based on these facts, we conclude it is unnecessary to address these discrepancies further.

[6] The jury's nonfinding for this firearm enhancement was not addressed on the record by the parties and trial court. We therefore do not consider it further on appeal.

under section 12022.53.[7] Further, the trial court imposed and stayed a one-year prior prison term enhancement under section 667.5, subdivision (b). Regarding Thomas, the trial court sentenced him to an aggregate term of four years plus life without the possibility of parole. The trial court also imposed restitution fines, fees, and assessments on Namauu and Thomas.

B. *Evidence Presented at Trial*[8]

### 1. Overview

On the evening of April 3, 2015, Namauu shot and killed 18-year-old Sam Weinberg. Namauu fired the fatal shot from the front passenger's seat of a car being driven by his codefendant Thomas. Their car had stopped next to Weinberg's SUV at a traffic light in Santa Cruz. Weinberg was driving the SUV, and his 26-year-old roommate, Michael Cook, was in the front passenger's seat.

The prosecution contended the killing was gang related, stemming from an earlier interaction between Weinberg and Thomas at a liquor store. The prosecution claimed Thomas and Namauu were Norteño gang members who took Weinberg to be a rival Sureño because he was wearing blue clothing, and the shooting resulted from the earlier interaction.

Namauu asserted he was not a gang member, had no knowledge of any interaction between Thomas and Weinberg at the liquor store, and was not aware of Weinberg until Weinberg's SUV was alongside Thomas's car at the traffic light. Namauu stated he saw what he believed was a gun in Weinberg's hand and fired at Weinberg in self-defense.

---

[7] When sentencing Namauu, the trial court did not mention the firearm enhancements found true by the jury under section 12022.5, subdivision (a), for counts 1 and 2. The court, however, imposed 10 years consecutively on count 4 for the firearm enhancement alleged under section 12022.5, subdivision (a). At Namauu's resentencing on remand, the trial court should state a disposition for the firearm enhancements found true under section 12022.5, subdivision (a), for counts 1 and 2.

[8] Additional facts will be discussed where relevant to the issues addressed in section II, *post*.

Thomas asserted he did not know Namauu had a gun or intended to use it to shoot Weinberg.

### 2. Prosecution Evidence

Namauu grew up in Hawaii and moved to Santa Cruz around 2010 or 2011, when he was about 18 or 19 years old. Namauu and Thomas became friends and were members of a Norteño gang called West Side Santa Cruz or West Side Chicos. The gang's members identified themselves with, among other symbols, red clothing and hand signs depicting the numbers 1 and/or 4 (representing the number 14) and the letter "W." Sureño gangs also existed in Santa Cruz and were rivals of West Side Santa Cruz. Sureño gang members associated with the color blue and the numbers 13 and 3.

In April 2015, Thomas lived in an apartment complex across the street from Lloyd's Liquors. Weinberg and Cook also lived nearby. Weinberg was a Sureño "wannabe," who associated with Sureño gang members and always wore blue clothing. In addition, Cook had a tattoo of three dots on his wrist. Cook testified that he received this tattoo when he was 16 or 17 and did not realize its significance until after he had gotten it.

On April 3, 2015, Weinberg was wearing a blue and white baseball cap and a dark blue shirt. After smoking a bowl of marijuana, Weinberg and Cook left their house about 6:45 p.m. to get dinner and alcohol. They drove in Weinberg's SUV to a nearby taqueria and picked up some food. Then they went to Lloyd's Liquors and browsed the liquor selection. As Thomas entered the store, Cook glanced at him. Cook bought a bottle of alcohol and stood a few feet away from the counter as Weinberg made a purchase. Thomas, who was wearing a gray T-shirt, stood in line behind Weinberg. Cook made eye contact with Thomas and gave him a nod. About 15 or 20 seconds later, Weinberg turned his head and looked at Thomas. According to Cook, Thomas "looked intimidating, almost intimidating." The look on Weinberg's face was "[t]he same. It was

6

intimidation." Weinberg and Thomas looked at each other for five or six seconds. Cook told Weinberg to keep his eyes to himself, and Weinberg turned back toward the counter.

About 7:20 p.m., Weinberg completed his purchase. As Weinberg walked out of the store, he said "what the hell is their frickin problem." Cook did not hear Thomas say anything in response.[9]

Weinberg and Cook got into Weinberg's SUV and started to drive out of the parking lot. There was a backup of cars leaving the parking lot; Weinberg and Cook waited in the line. Thomas exited the store and walked over to his car. Cook and Thomas made eye contact for about 10 seconds. While standing about five to ten feet away from Cook, Thomas "threw up some sort of a symbol" that looked like a "W" using "four fingers" on his right hand.

Thomas got into his car and pulled up behind Weinberg's SUV. Weinberg exited the parking lot, making a right turn toward his home. After driving a couple of blocks, Weinberg turned right onto River Street. Thomas followed Weinberg's SUV at a normal speed and distance.

Cook noticed that Weinberg appeared nervous. Weinberg looked in the rearview mirror frequently. Weinberg asked in a nervous voice, "what if they start shooting, what if they have a gun?" Weinberg asked Cook to retrieve a baseball bat from the back of the SUV, but Cook refused. Cook said he did not think they had a gun "but they are probably going to try to fight you and if they do[,] I don't have your back. You started this shit, so you better end it." Weinberg then made a call to a housemate.

While at a red light at the intersection of River Street and Water Street, Thomas's car stopped behind Weinberg and Cook. Weinberg's nervousness increased. When Weinberg started driving again, Thomas followed. Weinberg got even more nervous, and Cook was getting a little angry that Weinberg "had started this shit."

---

[9] Cook told police on the day of the murder that Weinberg and Thomas did not say anything to each other.

7

Weinberg drove a couple more blocks and stopped at a red light at the intersection of River Street and North Pacific Avenue. Thomas's car pulled up next to the driver's side of Weinberg's SUV, about three to five feet away. Weinberg's window was down, and he seemed scared. Weinberg turned and looked toward Thomas's car. Cook leaned forward and looked in that direction. Cook saw Thomas and Namauu looking back at him and Weinberg. Namauu looked "[p]retty pissed. Not too happy." Cook leaned back and heard Namauu ask in an intimidating and provocative way, "[W]here you from?" Cook knew this to be a gang-related question that usually resulted in a fight. Weinberg responded with "what the fuck?" Within seconds, Cook heard a gunshot.

Namauu fired one 10mm hollow point bullet at Weinberg. The bullet struck the pillar of Weinberg's driver's side door and then entered the left side of Weinberg's chest about five inches below his armpit. The bullet's jacket lacerated and lodged in Weinberg's heart.

Both cars accelerated quickly through the red light. Thomas's car turned to the left, and Weinberg's SUV veered right. Cook did not see Weinberg holding anything in his hands or that Weinberg had dropped anything. Weinberg tried to put his SUV in park, and the SUV stopped abruptly in the middle of the street. Weinberg said, " 'Fuck, Mikey. I'm dead. Take me to the hospital.' "

Cook got out of the SUV through the passenger's side door, ran around to the driver's side, opened the driver's door, unbuckled Weinberg, and pulled him out onto the ground. Weinberg was not responsive but was still breathing heavily. Cook yelled for someone to call the police, and said two Mexicans shot his friend.[10] Cook frantically asked a 911 dispatcher to send an ambulance and said that Thomas's car had followed them from the liquor store. Paramedics arrived and pronounced Weinberg dead.

---

[10] Cook testified that he could have been mistaken in his description of Namauu's and Thomas's ethnicity.

Inside the SUV, police found a knife underneath a tissue in the driver's door pocket and, in the rear cargo area, a baseball bat and an air pistol (BB gun) under some speakers and clothes.

At the police department later that evening, Cook looked through photographs and identified Namauu and Thomas. Cook told the police he was about 40 percent certain that Namauu was the shooter and 100 percent certain that Thomas was the driver.

Meanwhile, after the shooting, Thomas drove to his apartment. At 7:56 p.m., a bicyclist placed something in a dumpster near the apartment complex. The police subsequently searched the dumpster and discovered a pair of gloves next to a black beanie. The gloves had a small amount of gunshot residue on them.

The next morning, April 4, 2015, police officers staked out Thomas's apartment complex. Thomas came outside and walked toward a bus stop. Officers approached him. Thomas ran away. Later, Thomas returned to the bus stop and got on a bus. The police stopped the bus and ordered Thomas off. Thomas did not at first comply, but he did so when advised that a police canine would be deployed. Police arrested Thomas.

That same morning, the police also looked for Namauu. While driving, Namauu saw a police officer, accelerated, and got away. The police eventually arrested Namauu when he returned home. Namauu was wearing a red flannel shirt.

Later, police officers went to Namauu's home with a search warrant. Namauu's mother, Celina Malabey, refused to open the door. The officers forced the door open to execute the warrant. At trial, Malabey gave conflicting testimony about whether, when she visited Namauu in jail approximately one month after the shooting, Namauu said he was not worried about the gun and told her, "I wasn't even there."

Santa Cruz Police Department Detective Alex Martin testified as an expert on criminal street gangs. Detective Martin opined that Thomas and Namauu were members of and active participants in the West Side Santa Cruz gang. The trial court took judicial notice and informed the jury of several convictions of individuals related to the Westside

Santa Cruz gang, including of Thomas and Namauu.[11] Martin opined that various crimes had been committed by West Side Santa Cruz gang members and those crimes were the gang's primary activities. Martin explained how those crimes demonstrated the West Side Santa Cruz gang's pattern of criminal activity. In response to a hypothetical based on the facts of the charged crimes, Martin opined that many of the facts and events were gang related.[12]

### 3. Namauu's Evidence

According to the custodian of records at Salinas Valley State Prison, Namauu's central file with the California Department of Corrections and Rehabilitation (CDCR) did not indicate that Namauu was affiliated with a gang. When Namauu was released on parole in November 2014, the CDCR did not impose a condition prohibiting Namauu from associating with gang members.

Namauu's relative Elena Lopez testified that she had known Namauu his whole life. Namauu was born in Honolulu, and Namauu's father was Lopez's first cousin. Namauu lived with Lopez's mother in 2008, in an area of Oahu called Makakilo, which is "considered part of the west coast" and is about ten miles from Lopez's home in Waianae. Lopez explained that people in Hawaii used a "W" hand sign to mean "West Side Waianae." The hand sign has "[n]othing to do with gangs. Just a lot of pride [about] where we're from." Several photos showed Lopez's relatives holding up the "W"

---

[11] In March 2014, Thomas was convicted of carrying a concealed firearm on December 19, 2013, in violation of section 25400. In June 2013, Namauu was convicted of having committed an assault with a firearm on January 18, 2013. Namauu believed his victims were Sureños. For this conviction, Namauu was sentenced to three years in state prison.

[12] We describe Detective Martin's testimony and other gang-related evidence in more detail when discussing Namauu's claims challenging the admission of rap lyrics and the sufficiency of the evidence for his conviction under section 186.22, subdivision (a), *post*.

hand sign. Lopez last saw Namauu around 2009. Lopez did not know of Namauu ever having an experience with gangs.

Namauu testified in his own defense. Namauu denied that he is a gang member. He explained that none of his tattoos are gang related. Namauu used the "W" hand sign to indicate the west side portion of Santa Cruz, not a gang. Namauu wore red because he likes the color, not "[f]or a statement or purpose." He also wore clothing of all different colors.

Namauu wrote rap lyrics in a notebook while incarcerated in 2013 and 2014. Namauu's lyrics were an expression "of how it is in Santa Cruz" for him, but the lyrics included "made-up stories." Namauu and Anthony Morales took a photo in front of a sign at Beach Flats Park (an area claimed by Sureños) because Namauu had been at Morales's home in the Beach Flats area smoking marijuana and they walked over to the park. Namauu did not know about Morales or Thomas hanging out with Norteños.

Namauu became friends with Thomas in 2011 or 2012, after Namauu had been living in Santa Cruz for about a year. On the evening of April 3, 2015 (the evening of Weinberg's death), Namauu was with Thomas and Thomas's friend, Robert Halpin.[13] Namauu sat in Thomas's car outside of Lloyd's Liquors while Thomas was inside. Thomas listened to music, as did Halpin, who was in the back seat. Namauu did not see Cook or Weinberg at the liquor store.

After Thomas returned to his car, Namauu, Thomas, and Halpin headed to a cannabis club. During the drive from Lloyd's Liquors to the intersection of River Street and North Pacific Avenue, Thomas said he forgot his "California ID[,] his license" and needed to return home to retrieve it so he could get into the cannabis club. Namauu and

---

[13] Namauu testified that he believed the last name of Thomas's friend was "Halpren." However, the friend's last name is otherwise stated in the trial record as "Halpin," and the trial court took judicial notice that Robert Halpin died on October 17, 2015.

11

Thomas did not discuss anything other than Thomas's ID during the drive. There was no talk about Weinberg, Cook, or anything that had occurred in the liquor store. Namauu intended to return to Thomas's home when their car pulled up to the intersection of River Street and North Pacific Avenue.

Namauu shot Weinberg because Weinberg "pointed a firearm at" Namauu from about two feet away and Namauu was "scared for [his] life." Weinberg had asked Namauu, in a hostile tone, where he was from and then pointed a black handgun at Namauu. Namauu said, "what the fuck?" Namauu panicked and pulled out a 10mm Glock pistol he had in the waistband of his sweatpants. Namauu thought Weinberg was a Sureño because Weinberg was wearing blue. Namauu fired only one shot because he was trying to protect himself and get away. Prior to the shooting, Namauu did not indicate to Thomas or Halpin that he had a firearm.

About five seconds after Thomas sped away from the intersection, Thomas asked if everyone was all right. Namauu responded, "He pointed a gun at me." Calling 911 "didn't cross [Namauu's] mind." When Namauu, Thomas, and Halpin got to Thomas's apartment, Halpin took Namauu's gun and "said that he needed to get rid of it." Namauu did not know what Halpin did with the gun, and there was "no need for [Namauu] to keep it."

Namauu testified that he bought the gun he used to kill Weinberg "off somebody on the levee" in 2013. At that time, Namauu was out on bail after having been arrested for shooting at two Sureños who had robbed him. Namauu felt he needed the gun to protect himself because he had been mistaken for a rival gang member and had been threatened. At the time of his arrest in 2013, Namauu spoke to detectives who said "they would have done the same thing," i.e., arm themselves. This made Namauu think that protecting himself by carrying a gun "was right." Namauu acknowledged he had told his mother and aunt that he did not shoot Weinberg. Namauu did not want to worry his mother.

12

4. <u>Thomas's Evidence</u>

Thomas testified in his own defense. Thomas was born and raised in Santa Cruz. He met Namauu in 2012, and they became best friends around the middle of 2013. Thomas did not get involved in gangs, but he knew gang members, including Norteños and Sureño wannabes. Thomas started "throwing up Ws" in fifth grade. Thomas throws up Ws because he is originally from the west side of Santa Cruz, not because he is a member of the West Side Santa Cruz gang. Thomas's other best friend, Anthony Morales, lived near Beach Flats Park. Thomas did not have any "evil intent" when taking a picture in front of the Beach Flats Park sign. Thomas wrote rap lyrics "[t]o try to get famous," and his lyrics involved both true personal circumstances and "fantasy."

In December 2013, Thomas was arrested for having a loaded firearm inside his backpack, along with marijuana and cash. Thomas was "not too sure" why he wrote "WSSC" on his backpack in very bright letters.[14] He had the gun because he was dealing marijuana, cocaine, and methamphetamine at that time. He was still selling marijuana at the time Namauu shot Weinberg.

Thomas lived very close to Lloyd's Liquors and visited the store almost daily. On the day of Weinberg's death, Thomas and Namauu went on a bike ride and ended up at Thomas's apartment. Later, they left the apartment at 6:32 p.m. to drop off Namauu's bicycle at his home. They saw Halpin and picked him up. Eventually, Thomas, Namauu, and Halpin went to Lloyd's Liquors for beer. Thomas went inside.

While Weinberg was in line, he turned around and "looked up and down" at Thomas. Thomas gave Weinberg a "dirty look." As Weinberg was leaving the store, he mumbled something in Thomas's direction. Thomas did not know if Weinberg's statement were directed at him, and he did not understand what Weinberg had said. Thomas did not say anything back.

---

[14] Detective Martin testified that WSSC is a symbol of the West Side Santa Cruz gang.

13

Thomas left the store and returned to his car. He did not see where Weinberg had gone and did not see the vehicle Weinberg was driving. Thomas did not make "any sort of offensive gesture" toward Weinberg in the parking lot, throw a gang sign, or make any hand sign in the direction of Weinberg or Cook. Thomas did not say anything to Namauu and Halpin about what had happened inside Lloyd's Liquors. Thomas intended to go next to a cannabis dispensary.

Thomas did not know or care that Weinberg was in a vehicle ahead of his. When Thomas got to the intersection of Water Street and River Street, he realized he did not have any identification with him. While stopped in the left-turn lane at a red light at North Pacific Avenue, someone in the vehicle next to Thomas's said "where are you from?" Namauu said "what the fuck?" As Thomas was about to look up in that direction, he heard a gunshot. He ducked down and drove through the red light, making a left turn on to North Pacific Avenue. Thomas did not know that Namauu had a gun or who fired the gunshot.

Thomas asked Namauu and Halpin if they were all right and then drove to his apartment without further conversation. At the apartment, Thomas went to the bathroom, and during that time Halpin left. Namauu thereafter told Thomas that he had given a gun to Halpin. This moment was the first time Thomas suspected that it was Namauu who had fired the gunshot. Thomas saw two gloves and a beanie on a chair and asked Namauu what they were. Afraid there might be gunshot residue on the items, Thomas threw them away in a dumpster outside of the apartment complex.

Thomas rode his bicycle back toward the scene to see if someone had been shot. After seeing police cars and barricades, Thomas thought someone "probably got shot." Thomas returned home. After Namauu left, Thomas checked his car for an expended cartridge casing.

The next morning, Thomas walked to a bus stop intending to take the bus to visit his mother in Watsonville. Thomas wanted to talk to his mother about what she thought

14

he should do and to see if she could hire an attorney for him. However, Thomas saw two detectives, decided to go back inside his apartment, and then ran from police because he "was nervous and [] didn't want to get caught yet." He "wanted to explain the situation to [his] mom before [he] went to jail."

## II. DISCUSSION

Namauu and Thomas raise 11 claims of error, jointly and separately. Namauu and Thomas jointly argue: (1) the trial court erred by precluding the impeachment of victim/eyewitness Michael Cook with his prior conviction and misconduct; (2) the trial court erred by precluding the introduction of a statement Namauu had made to his former attorney about the crime; (3) the trial court erred by precluding the introduction of certain photographs of Sam Weinberg; (4) the cumulative effect of the trial court's allegedly erroneous evidentiary rulings was prejudicial; (5) there was insufficient evidence regarding their participation in a criminal street gang; and (6) the trial court erred by failing to hold a hearing on their ability to pay the fines and fees imposed at their sentencings.

Namauu separately argues: (1) the trial court erred by admitting evidence about Namauu's 2013 crime and conviction for assault with a firearm; (2) the trial court erred by admitting rap lyrics Namauu authored; (3) the matter should be remanded for the trial court to exercise its newly conferred sentencing discretion under Senate Bill No. 1393 (2017-2018 Reg. Sess.) to strike the five-year prior serious felony enhancement; and (4) the one-year prior prison term enhancement that was imposed and stayed should be stricken under Senate Bill No. 136 (2018-2019 Reg. Sess.).

Thomas separately argues that the trial court erred by denying his motion to suppress evidence seized as a result of three warrant-based searches and a pat search of his person and backpack.

15

We will first address Namauu's and Thomas's claims concerning the admission, exclusion, or suppression of evidence. We next will consider their challenge to the sufficiency of the gang crime evidence. Finally, we will examine their sentencing claims.

A. *Admission of Evidence Regarding Namauu's Prior Crime and Conviction*

1. Additional Background

The prosecutor moved in limine to admit Namauu's 2013 felony conviction for assault with a firearm, the facts underlying that conviction, and Namauu's statements to police about the incident. Namauu also moved in limine to preclude "any mention of his prior arrests, convictions, or violations of any terms of his prior supervision."

After hearing argument from the parties on the in limine motions, the trial court permitted the prosecutor to present evidence about Namauu's 2013 crime and conviction. The court concluded that Namauu's 2013 conviction was probative of the gang charge and gang enhancements. Regarding Namauu's statements to police about the incident, the court explained "it's not remote. It's an admission. It's an admission post *Miranda*. I think it's relevant from . . . three or four different perspectives." "[H]aving him admit that he shot at two Sure[ñ]os in a relatively short period of time before [the current crime], that's definitely probative." Namamu objected that the evidence was more prejudicial than probative. The trial court reiterated "that shooting at Sure[ñ]os in a non remote time frame from the time of this incident is relevant, is probative. It's not significantly more prejudicial than probative and [Namauu's] statement will be allowed."

During his opening statement prior to the start of the prosecutor's case, Namauu's trial counsel mentioned Namauu's 2013 interview with detectives and said one reason Namauu carried a firearm at the time of the current crime "was that law enforcement told him that he was responsible for protecting himself."

During the prosecutor's case, the prosecutor proposed that the parties stipulate to introduce the detectives' entire 2013 interview of Namauu. Namauu indicated his agreement with such a stipulation but he first wanted to make sure the interview was

appropriately redacted. The trial court indicated that the detectives' statements made to Namauu about protecting himself "possess minimal probative value" when considered in context. Namauu argued that the detectives' statements to him were probative of his state of mind. The court said that "this is a nonissue if [Namauu is] going to testify. Then I think all of it becomes relevant and probative." Ultimately, the trial court deferred ruling on the detectives' statements, saying "until evidence is presented to the trier of fact and the Court has an opportunity to hear that, but I'm not aware of at this point any evidence that shows that any discussion that Mr. Namauu had with law enforcement had any impact on what happened" on the day of Weinberg's shooting.

Later in the prosecutor's case, the prosecutor asked the trial court to rule on the admission of Namauu's 2013 interview. The trial court stated, "If Mr. Namauu is not testifying then I find little or no relevance to the references offered by Detective Schonfield, but if he is testifying then potentially the entire statement from the Court's perspective is probative." The prosecutor and Namauu agreed to craft their examinations of Detective Schonfield about the interview in accord with the court's ruling.

The prosecutor presented evidence to the jury about Namauu's 2013 crime and conviction through multiple witnesses. The evidence established that on January 18, 2013, police officers stopped Namauu while he was driving a car. Namauu was wearing a blue shirt and a hat with a bill with a red underside. An officer searched Namauu's car and discovered a Glock 9mm handgun under the driver's seat. In the cupholder of the center console was an expended 9mm cartridge casing.

Following his arrest on January 18, 2013, Namauu spoke to Detectives Schonfield and Cline. Namauu said that he had been robbed two weeks earlier by four Sureño gang members wearing blue in an area claimed by the Beach Flats Sureños. One robber had a knife; another had a gun. They ordered Namauu to the ground, took his belongings, examined his identification, and threatened him.

17

Two weeks later, while driving on January 18, 2013, Namauu saw people he thought had been involved in the robbery, but Namauu was not certain and could not provide detailed descriptions of the men. Namauu said the men displayed gang signs using three fingers. One of them lifted his shirt, and another picked up a rock. Namauu said he thought he might have seen a gun, but he was not certain. Namauu initially told the detectives that he had no knowledge of how the gun and casing got in his car, but he later indicated he had his grandmother's Glock in the car. Namauu did not explicitly admit to having fired the gun. However, when asked by the detectives about firing the gun, Namauu did not deny doing so and said " 'I guess I was intending to hurt those two or whatnot.' "

The jury also heard testimony from a probation officer who had obtained a statement from Namauu for a pre-sentence report concerning his sentencing for the 2013 conviction. Namauu indicated he had feared for the safety of his family and himself after the robbery because the robbers knew his personal information. But at the time of the shooting, Namauu was not afraid because he had a gun. When one of the men lifted his jacket, Namauu "saw something black." Namauu said his gun went off accidentally. Namauu promised to the probation officer that he " 'w[ould] not do this again' " and that his " 'time in jail was his wakeup call.' "

The trial court told the jury that on June 18, 2013, Namauu was convicted of assault with a firearm under section 245 for the January 18, 2013 incident and, on August 27, 2013, was sentenced to three years in prison.

Detective Martin opined that the January 18, 2013 incident and conviction were significant to Namauu's gang membership and participation because Namauu shot at people he believed were Sureño gang rivals. Further, a shooting committed in response to a robbery is consistent with the cycle of gang violence and retaliation.

During the defense case, Namauu testified about the 2013 incident. Namauu said he shot at two people who had robbed him. Namauu's counsel initially played portions

18

of a video of the detectives' interview of him. Namauu said those portions of the interview were significant for him with regard to his need to protect himself by carrying a firearm. Namauu's counsel then played the entire video of the 2013 interview for the jury.

On appeal, Namauu contends the trial court prejudicially erred by admitting the evidence about his 2013 crime and assault conviction because the "evidence beyond the felony conviction itself was, on the one hand, marginally relevant at best, and, on the other hand, highly prejudicial." Namauu further contends that, in so ruling, the trial court violated Namauu's constitutional due process rights.[15]

### 2. Legal Principles

"Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352[16] for abuse of discretion. [Citation.] We will not reverse a

---

[15] Namauu also asserts that his two substantive claims of error were properly preserved for appellate review and, in the alternative, his trial counsel was in effective for failing to object on the grounds raised in this appeal. The Attorney General does not argue that Namauu forfeited his substantive claims. Because we have reviewed the merits of Namauu's substantive claims (see *People v. Partida* (2005) 37 Cal.4th 428, 435–438), we do not address Namauu's alternative claim of ineffective assistance of counsel.

[16] Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*).)

" ' "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 947 (*Jones*); see also Evid. Code, § 1101; *People v. Abilez* (2007) 41 Cal.4th 472, 500 [discussing admissibility of prior crimes evidence under Evidence Code section 1101]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*) [discussing the application of Evidence Code section 352 to uncharged crimes evidence admissible under Evidence Code section 1101].) Evidence Code section 352 " 'requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' " (*Jones*, at p. 948.) " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Id.* at p. 949.)

3. Analysis

Namauu makes three principal arguments challenging the relevance of the evidence concerning his 2013 crime and conviction. First, he contends that his "prior conviction for assault with a firearm was not admissible as a predicate offense" for the gang charge and enhancements, because "the prosecution already had evidence of multiple other convictions of [additional] individuals" and "also could have used the charged murder of Sam Weinberg in this case as another predicate offense." Second, Namauu asserts that, even if his prior crime was "marginally probative" as a basis for Detective Martin's opinion regarding Namauu's gang membership, "it was unnecessary because Martin had plenty of other information he could use to form his opinion." Third, Namauu maintains that his 2013 crime and conviction "bore little relevance to [Martin's]

20

opinion" about Namauu's level of participation in the gang, because the crime and conviction occurred two years before the current crime and "there was plenty of other evidence the prosecution had to establish [Namauu's] 2015 participation."  In addition, Namauu contends that evidence of prior misconduct is inherently prejudicial and was particularly prejudicial here because the prior crime and the current crime involved "shooting Sure[ñ]os."

For the reasons set out below, we are not persuaded that the trial court erred by admitting the evidence of Namauu's 2013 crime and conviction.  As Namauu acknowledges, his 2013 assault conviction itself was alleged as the underlying felony conviction for the charges in count 6 for possession of a firearm by a felon (§ 29800, subd. (a)(1)) and count 7 for possession of ammunition by a prohibited person (§ 30305, subd. (a)(1)).  The prosecution therefore was required to present proof of Namauu's prior conviction to establish his commission of these crimes.[17]  (*People v. Arce* (2020) 47 Cal.App.5th 700, 714 [elements of section 29800, subdivision (a)(1)]; CALCRIM No. 2591 [elements of section 30305, subdivision (a)].)

Further, Namauu's 2013 crime and conviction were relevant to prove the elements of the gang charge under section 186.22, subdivision (a), and the gang enhancements under section 186.22, subdivision (b).[18]  (See *People v. Albillar* (2010) 51 Cal.4th 47, 54–56 [elements of section 186.22, subdivision (a)]; *id*. at pp. 51, 59, 64–65 [section 186.22, subdivision (b)].)  As Detective Martin explained during his testimony, Namauu's actions in shooting at and retaliating against Sureños tended to prove his membership and participation in the West Side Santa Cruz gang.

[17] Namauu does not point us to any portion of the trial record indicating that he offered to stipulate to the facts of his prior conviction.

[18] We note that Namauu separately challenges the sufficiency of the evidence presented by the prosecution to prove that the West Side Santa Cruz gang "ha[d] as one of its primary activities the commission of one or more specified crimes in subdivision (e)" of section 186.22.  Assault with a deadly weapon under section 245 is a specified crime in section 186.22, subdivision (e)(1).

21

Moreover, this case is not like the one on which Namauu principally relies, *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*). There, the evidence established that the defendant had, among other things, claimed membership in a gang to the police at least twice. (*Id*. at p. 166.) The Court of Appeal concluded the trial court erred by admitting defendant's prior juvenile offense as a predicate offense for a gang enhancement because, in part, the defendant's "status as a gang member was [] overwhelming. Thus, the evidence of [defendant's prior] robbery adjudication was 'merely cumulative regarding an issue that was not reasonably subject to dispute.' " (*Id*. at p. 169.) By contrast, Namauu's status as a gang member was in dispute. Although Namauu maintains on appeal that the "evidence linking [him] to WSSC was just as great" as that in *Leon*, when he spoke to the detectives in 2013, Namauu denied that he was a gang member. Further, Namauu testified at his trial in this case that he is "not a gang member or a gangster."

Turning to the question whether the probative value of evidence of Namauu's prior assault is substantially outweighed by a substantial danger of undue prejudice, we are not convinced the evidence presented in this case was unduly prejudicial. "Evidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual" ' [citation] or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 475 (*Cowan*).) " 'In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) In our judgment, the evidence of Namauu's 2013 assault and conviction was not of such a nature that it would inflame the emotions of the jurors or mislead them from their task of deciding whether the prosecution proved Namauu's guilt of the current charges. The 2013 shooting did not result in physical injury and was not a particularly heinous crime. Further, although there is an inherent risk of prejudice with evidence of uncharged offenses (*Ewoldt*, *supra*, 7 Cal.4th at p. 404), for the reasons discussed above, the probative value of the evidence here is substantial. In addition, the trial court

22

instructed the jurors not to conclude from the "evidence of gang activity" that "the defendant is a person of bad character or that he has a disposition to commit crime." We presume that the jurors followed the court's limiting instruction. (*People v. Case* (2018) 5 Cal.5th 1, 32.)

Likewise, there was no violation of Namauu's constitutional rights to due process. The admission here of highly probative evidence was both appropriate and unexceptional, and it did not render Namauu's trial fundamentally unfair. (See *Jones*, *supra*, 57 Cal.4th at p. 949; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 26; *Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 920.)

In sum, we conclude the trial court did not abuse its discretion in admitting the evidence of Namauu's 2013 crime and conviction for assault with a firearm; we also decide no constitutional violation occurred.

B. *Preclusion of Impeachment of Victim/Eyewitness*

Namauu contends the trial court prejudicially erred by precluding the defense from impeaching Michael Cook with his "prior conviction for receipt of stolen property and his prior acts of vandalism; domestic violence; and providing false information to the police." Thomas joins Namauu's argument in full.

1. Additional Background

The prosecutor moved in limine to preclude Namauu and Thomas from impeaching Cook with evidence of his prior arrests and convictions because they were "remote and do not reflect on his current trait for honesty."

According to the prosecutor's motion, Cook had the following arrests and convictions:

(1) November 19, 2007:  misdemeanor conviction for contempt of court (§ 166, subd. (a)(4)), after an arrest (on October 12, 2007) for false imprisonment (§ 237, subd. (a)) and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1));[19]

(2) August 25, 2008:  arrest for contempt of court (§ 166, subd. (a)(4));

(3) September 29, 2008:  arrest for giving a false identity to a peace officer (§ 148.9, subd. (a));

(4) November 14, 2008:  felony conviction for receiving stolen property (§ 496, subd. (a)), which subsequently was reduced to a misdemeanor on December 18, 2012 (arrest date of September 29, 2008);

(5) February 18, 2009:  arrest for vandalism (§ 594, subd (a));

(6) October 2, 2009:  arrest and subsequent misdemeanor conviction (on an unspecified date) for contempt of court (§ 166, subd. (a)(4));

(7) September 15, 2011:  arrest for contempt of court (§ 166, subd. (a)(4)); and

(8) June 10, 2013:  arrest for domestic violence (§ 273.5).[20]

The trial court heard argument on the prosecutor's in limine motion.  Namauu argued that prior acts of dishonesty and giving a peace officer a false information were "high[ly] probative of [Cook's] ability to be honest."  Thomas asserted that the trial court should admit the convictions for contempt of court (in November 2007 and around October 2009) and receiving stolen property (in November 2008).  Both Namauu and Thomas also argued that the remoteness of Cook's prior conduct should be measured from the time of the current crime in April 2015, not from the trial date three years later.  The prosecutor disagreed regarding the remoteness measurement and argued, among

[19] The prosecutor's motion did not state the crime of conviction.  However, during argument on the motion, the prosecutor clarified "with regard to number one, that was a subsequent conviction of [section] 166[, subdivision] (a)(4)."

[20] The prosecutor's motion also stated in a footnote that in 2013 Cook was "arrested for being drunk in public and driving under the influence.  He was subsequently convicted in the driving under the influence case."  Neither party mentions this conviction in their briefing to this court.

other things, that proving the facts regarding Cook's arrests would be unduly time consuming.

The trial court granted the prosecutor's motion, stating: "I find the misdemeanor convictions remote. They are 11 years ago. In terms of arrests[,] I find them remote and irrelevant." The court considered the arrests and convictions that occurred in 2011 and earlier to be too remote in time. Further, "[a]s to [the] issue of arrests from [an Evidence Code section] 352 perspective," the court saw "minimal probative value to an arrest nine or ten years ago" and "believe[d] it would be unduly time consuming to go through those incidents."

### 2. Legal Principles

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931 (*Clark*); see *People v. Dalton* (2019) 7 Cal.5th 166, 214 (*Dalton*).) Evidence Code section 788 provides for the impeachment of a witness with a prior felony conviction. "Misdemeanor convictions themselves are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion." (*People v. Chatman* (2006) 38 Cal.4th 344, 373 (*Chatman*); see *People v. Woodruff* (2018) 5 Cal.5th 697, 763.)

" '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.] When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time . . . . [Citations.] Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative

25

of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude.  [Citation.]  As we have advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' " (*Clark*, *supra*, 52 Cal.4th at pp. 931–932*.*)  When the witness subject to impeachment is not the defendant, the factors to be considered "prominently include whether the conviction (1) reflects on honesty and (2) is near in time."  (*People v. Clair* (1992) 2 Cal.4th 629, 654.)

"Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.'  [Citation.]  In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352.  [Citation.]  A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623–624; see *Dalton*, *supra*, 7 Cal.5th at p. 217; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 998–999 (*Cunningham*); *People v. Snow* (2003) 30 Cal.4th 43, 90.)

"A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705; see *Clark*, *supra*, 52 Cal.4th at p. 932.)

26

3. Analysis

Namauu, joined by Thomas, challenges as an abuse of discretion and a violation of his constitutional rights the trial court's preclusion of impeachment of Cook with the following: the September 2008 act of giving a false identity to a peace officer; the November 2008 conviction for receiving stolen property; the February 2009 act of vandalism; and the June 2013 act of domestic violence.[21] Namauu and Thomas argue that Cook's conviction and other misconduct were not too remote and Cook "certainly has not led a legally blameless life since his felony conviction in 2008." Namauu and Thomas contend further that Cook's conviction and his act of lying to a peace officer involved dishonesty. Namauu and Thomas maintain the specified impeachment evidence was important to challenging Cook's credibility because "the defense had no other extrinsic evidence with which to impeach" Cook. Lastly, Namauu and Thomas dispute the trial court's finding that the impeachment would have been unduly time consuming.

We are not persuaded the trial court abused its discretion in precluding the impeachment of Cook with the specified evidence. Namauu and Thomas describe Cook's 2008 conviction for receiving stolen property as a "felony conviction." However, according to the prosecutor's in limine motion, Cook's 2008 conviction under section 496, subdivision (a), resulted in a grant of probation and was subsequently reduced from a felony to a misdemeanor. (See § 17, subd. (b)(3); *People v. Orozco* (2020) 9 Cal.5th 111, 117 [section 496, subdivision (a), was a "wobbler" offense].) Accordingly, Cook's

---

[21] Regarding the Attorney General's contention that Namauu and Thomas forfeited their concomitant constitutional assertions of due process and confrontation clause violations, we decline to apply the doctrine of forfeiture to Namauu's and Thomas's constitutionally based arguments. The arguments here "do not invoke facts or legal standards different from those the trial court itself was asked to apply." (See *Cowan*, *supra*, 50 Cal.4th at p. 464, fn. 20; *People v. Ervine* (2009) 47 Cal.4th 745, 771, fn. 12 (*Ervine*).) Because we have reviewed the merits of Namauu's and Thomas's constitutional claims, we do not address their alternative contention of ineffective assistance of counsel.

conviction is properly considered a misdemeanor conviction and thus was not, itself, admissible for impeachment. (See *Chatman*, *supra*, 38 Cal.4th at p. 373; *Truman v. Thomas* (1980) 27 Cal.3d 285, 296 [discussing reduced conviction].)

Furthermore, irrespective of whether the 2008 conviction was itself admissible, the trial court reasonably concluded that the conviction and conduct underlying Cook's arrests and conviction were remote, of minimal probative value, and might involve an undue amount of time. Remoteness can be "measured from the date the witness suffered the conviction, or was released from imprisonment therefor, whichever is later, to the date the witness takes the stand. [Citation.] The law deems relevant the comparison between the person as he was *then* and the person as he is *now*. It implicitly asks this question: 'The witness was a criminal once: is he rehabilitated today?' " (*People v. Turner* (1994) 8 Cal.4th 137, 214–215 (conc. opn. of Mosk, J.), abrogated on other grounds by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Cook's last arrest occurred in 2013, about five years before he testified in May 2018. Although Cook had not led a "legally blameless life" (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 926 (*Mendoza*)) between 2008 and 2013, he did not suffer any arrests for several years before the trial, and his contacts with law enforcement ceased when he was about 24 years old. Further, Cook's last acts of dishonesty occurred in 2008, nearly 10 years before he testified. Under these circumstances, we conclude the trial court did not act arbitrarily when it considered significant the amount of time that had passed since Cook engaged in misconduct and weighed that remoteness against allowing impeachment.

Relatedly, the trial court opined that the probative value of Cook's conviction and misconduct was minimal given the passage of time. The court's finding in this regard is similarly not arbitrary, capricious, or absurd. It was appropriate for the court to discount the probative value of Cook's conviction and misconduct as its remoteness increased. (*Mendoza*, *supra*, 78 Cal.App.4th at pp. 925–926.) Further, regarding the probative value of Cook's underlying misconduct more broadly, only the act of receiving stolen property

28

resulted in a conviction. The parties have not pointed this court to any information in the record that describes the facts underlying any of Cook's arrests. Although Cook was arrested for conduct that legally amounts to moral turpitude and dishonesty, we are unaware of any particulars regarding those acts.

"It is appellant's burden to affirmatively demonstrate error by an adequate record; error is never presumed." (*People v. Blackwood* (1983) 138 Cal.App.3d 939, 949; see also *People v. Wiley* (1995) 9 Cal.4th 580, 592, fn. 7; *People v. Seneca Ins. Co.* (2004) 116 Cal.App.4th 75, 80.) Without more information about the nature of Cook's four acts of misconduct, we cannot conclude that the trial court abused its discretion when it assigned limited weight to their probative value. (See *Clark*, *supra*, 52 Cal.4th at p. 931.)

Namauu and Thomas challenge the trial court's finding regarding the undue consumption of time. Namauu and Thomas acknowledge an examination of Cook regarding the misconduct that did not result in conviction may have required some time "to establish exactly what Cook did that was dishonest and reflective of moral turpitude." Nevertheless, Namauu and Thomas maintain that establishing the underlying misconduct "would not have required an extensive cross-examination." Without knowing something more than that Cook was arrested for four acts of misconduct and convicted for one of those, we are unable to make an informed judgment about how the examination of Cook would have unfolded had the impeachment been allowed. The trial court has broad power to control the presentation of proposed impeachment evidence " ' "to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." ' " (*People v. Lewis* (2001) 26 Cal.4th 334, 374–375.) It is not appropriate for this court to conclude, based on guesswork, that the trial court acted arbitrarily when it deemed undue the time that would be required to present the underlying facts of Cook's misconduct.

For these same reasons, we are not persuaded that any constitutional violation occurred here. The trial court's preclusion of impeachment was proper under the

29

Evidence Code and precedent. Further, Namauu and Thomas fail to demonstrate how the presentation of the bare fact of Cook's conviction and purported misconduct (i.e., receiving stolen property, giving a false identity to police, vandalizing property, and inflicting injury on a domestic partner) " 'would have produced "a significantly different impression of [the witness's] credibility." ' " (*People v. Dement* (2011) 53 Cal.4th 1, 52, overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Namauu and Thomas cross-examined Cook on multiple topics including his prior statements about the crime, his three-dot tattoo, the uncertainty in his identification of Namauu on the day of the crime, his marijuana use, and his bias in favor of the prosecution. On this record, we cannot find that the proposed impeachment would have made a significant difference to the jury's evaluation of Cook's credibility.

For these reasons, we conclude the trial court did not err when it exercised its discretion to prohibit Namauu and Thomas from questioning Cook about his prior conviction and misconduct. Further, we decide that the trial court's exclusion of this evidence did not violate Namauu's and Thomas's constitutional rights.

C. *Preclusion of Namauu's Statement to his Former Attorney*

Namauu contends the trial court prejudicially erred and violated his right to present a defense when it precluded him from presenting his prior statement to a former attorney admitting his presence at the shooting scene and reaffirming his fear about seeing Weinberg with what he thought was a gun. Thomas joins Namauu's argument in full.

1. Additional Background

As part of its case in chief, the prosecution presented testimony from Namauu's mother, Celina Malabey. Over hearsay objections by Namauu and Thomas, the trial court allowed the prosecutor to ask Malabey whether Namauu had told her that he was

30

not present when Weinberg was shot.[22]  Malabey gave conflicting testimony about Namauu's statements to her.  Initially, after being shown a transcript of a jail visit Malabey had with Namauu on May 3, 2015, Malabey said she recalled that Namauu had told her he "wasn't even there" and was not worried about the gun.  When the prosecutor proceeded to ask additional questions about other similar statements Namauu had made during the visit, Malabey said she did not remember them.  Upon further questioning, Malabey said she did not "remember being in this conversation," despite "accepting what [she was] reading [in the transcript] to be true."  Malabey concluded her testimony on this subject by saying she did not remember—independently of the transcript—that Namauu had said he was not at the scene of Weinberg's death and did not shoot someone.

Later, during Namauu's own direct testimony, he explained why he had told his mother that he did not fire the gun.  Namauu said he "didn't want [Malabey] worrying about it, worrying about me."  Namauu also said he did not recall telling other people he did not fire the gun.  When asked on cross-examination about the conversation he had with his mother in jail, Namauu said he "believe[d]" he told her that he had not been at the shooting and had not fired the gun.  The prosecutor also questioned Namauu about having told his aunt that he did not fire the gun, was not at the scene, and the police thought he was involved because his friend was involved.  Namauu admitted lying to his aunt because he was not inclined to talk about the facts of the case during a recorded jail phone call.

At the conclusion of Namauu's testimony, the parties discussed his request to call his former attorney, Mark Briscoe, as a witness.  Briscoe had represented Namauu very early in this case, from April 8, 2015 through April 22, 2015.  Namauu asserted Briscoe would testify that Namauu told him "that he was scared and that he saw the person with the gun . . . and then Mr. Briscoe counselled [Namauu] not to talk to him about the case

---

[22] The trial court overruled Thomas's objection to this evidence because Malabey's testimony on this subject was offered solely against Namauu.

until they get additional police reports and such." Namauu also told the trial court he "would give a complete waiver of privilege with regards to Mr. Briscoe." Namauu argued that his statement to Briscoe was made before his statements to his mother and aunt and was "relevant as a prior consistent statement and admissible under Evidence Code Section 791." Namauu also argued the prosecutor tried to suggest that Namauu's testimony was "recently fabricated or is influenced by bias or improper motive" and noted that the statement Namauu "gave to Mr. Briscoe was made before the fabrication." In addition, Namauu maintained that, if the trial court were to exclude Briscoe's testimony, it should preclude the prosecutor from presenting any rebuttal evidence or arguing that Namauu had made prior inconsistent statements to his mother and his aunt or had recently fabricated his testimony.[23]

The prosecutor replied that she had "no intention of arguing that [Namauu's testimony] was fabricated for trial." She maintained that she should be allowed to "argue [Namauu's] particular statements" because "[t]hose statements are in evidence and he made them." The prosecutor further contended that "if counsel opens the door to privilege, that is a wide open door" and "it would be very time consuming" because she would "then get to evaluate the relative credibility both of Mr. Namauu as well as Mr. Briscoe."

The trial court denied Namauu's request to present Briscoe's testimony. The court noted that Briscoe had previously represented Namauu on his 2013 felony conviction for assault with a firearm and explained that the examination of Briscoe "regarding that 2013 incident could be extensive in nature." The court also observed that Namauu had testified to the reasons why he provided the asserted inconsistent information to his aunt and mother. The court adopted its earlier tentative ruling, in which it had stated that "a partial waiver of the privilege would not be appropriate" and "[f]rom an Evidence Code

_____

[23] Thomas did not make any argument to the trial court on Namauu's request to call Briscoe.

32

Section 352 analysis," the proposed testimony was inadmissible. Further, the court stated it was "not expecting any argument" asserting Namauu recently fabricated his explanation for his statements and would "look with chagrin as to any further rebuttal evidence regarding the issue of alleged inconsistent statements."

### 2. Legal Principles

"A prior consistent statement is admissible as an exception to the hearsay rule if it is offered after admission into evidence of an inconsistent statement used to attack the witness's credibility and the consistent statement, was made before the inconsistent statement; or when there is an express or implied charge that the witness's testimony was recently fabricated or influenced by bias or improper motive, and the statement was made before the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.)" (*People v. Kennedy* (2005) 36 Cal.4th 595, 614, disapproved of on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Under Evidence Code section 352, a trial court may exclude otherwise admissible evidence if its probative value is substantially outweighed by the probability that its admission will unduly consume time, create a substantial danger of undue prejudice, confuse the issues, or mislead the jury. (*People v. Mincey* (1992) 2 Cal.4th 408, 439.) An appellate court reviews a trial court's ruling made under Evidence Code section 352 for abuse of discretion and will not reverse a trial court's ruling on such matter without a showing that " ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman*, *supra*, 60 Cal.4th at p. 74.) Further, a trial court's decision to exclude evidence under Evidence Code section 352 does not infringe on a defendant's due process right to present a defense, unless the excluded evidence is of "*significant* probative value" to the defense. (*Cunningham*, *supra*, 25 Cal.4th at pp. 998–999.)

33

3.  <u>Analysis</u>

Before we determine whether the trial court erred by precluding Namauu from calling his former attorney, Briscoe as a witness, we address whether Namauu and Thomas properly preserved their claims for appellate review.

The Attorney General contends that Namauu forfeited his current assertion of a constitutional violation of his right to present a defense because, at trial, Namauu based his request to introduce Briscoe's testimony only on Evidence Code section 791.  Despite Namauu's reliance solely on the Evidence Code at trial, we conclude that application of forfeiture to Namauu's constitutional argument is unnecessary here.[24]  (See *Cowan*, *supra*, 50 Cal.4th at p. 464, fn. 20; *Ervine*, *supra*, 47 Cal.4th at p. 771, fn. 12.)

The Attorney General further asserts that it is "unclear whether Namauu states a cognizable claim for relief," because "it is not clear that there was even a prior inconsistent statement that could be rebutted."  The Attorney General bases his assertion on Malabey's conflicting testimony and her ultimate statement that she did not remember Namauu saying he was not at the crime scene and did not shoot anyone.  We reject the Attorney General's argument.  Although Malabey's testimony changed as to her independent ability to recall what Namauu said, Malabey testified initially that Namauu said "I wasn't even there."  Namauu's statement to Malabey that he was not at the crime scene was inconsistent with his trial testimony and presumably was presented during the prosecution's case in chief "for the purpose of attacking [Namauu's] credibility."  (Evid. Code, § 791, subd. (a).)  Moreover, the Attorney General states, without qualification later in his brief, that he "agrees that Namauu's statement to Briscoe was admissible under Evidence Code section 791, subdivision (a)."  For these reasons, we conclude Namauu's current claim is appropriately grounded on the admissibility of a prior consistent statement.

---

[24] Because we will review the merits of Namauu's constitutional claim, we do not address his alternative claim of ineffective assistance of counsel.

34

Regarding Thomas, the Attorney General argues that Thomas's joinder in this claim should be rejected because Thomas did not in the trial court join Namauu's request to admit Briscoe's testimony and, further, Malabey's testimony was admitted solely against Namauu. We agree that Thomas forfeited his current challenge to the trial court's ruling and thus reject his joinder of the claim on appeal. (See *People v. Wilson* (2008) 44 Cal.4th 758, 793 (*Wilson*); *People v. Chism* (2014) 58 Cal.4th 1266, 1292–1293 (*Chism*); see also *People v. Avila* (2006) 38 Cal.4th 491, 582 (*Avila*).)

Turning to the merits of Namauu's claim, Namauu characterizes his statement to Briscoe as an admission of his presence at the shooting, an implied admission that he was the shooter, and a statement about his fear and observation of Weinberg holding what Namauu believed was a gun. Namauu argues that Briscoe's testimony "would have gone a long way to counter" the damage caused by his statement to Malabey about him not being at the shooting, because "the jurors may have chalked up his inconsistent statement [to Malabey] as that of a son not wanting his mother to know about any of this and not a sign that his trial testimony was untruthful." Further, Namauu contends that without Briscoe's testimony, a reasonable juror likely "reach[ed] the conclusion that if Namauu truly acted in self-defense he would not have lied by denying his presence there altogether." In addition, Namauu argues that Briscoe's testimony was not cumulative of Namauu's testimony, because Namauu's explanation for his inconsistent statement to his mother "was not the same as an actual out-of-court statement he made to his attorney prior to the inconsistent statement to his mother that was consistent with his trial testimony." Regarding, the waiver of the attorney-client privilege and undue consumption of time, Namauu contends that, irrespective of his complete waiver of the privilege, Briscoe's limited direct testimony regarding the current charges would not have opened the door to cross-examination on Namauu's 2013 crime.

In our judgment, the trial court's ruling precluding Briscoe's testimony does not fall " 'outside the bounds of reason.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 408.)

35

We acknowledge that Namauu's prior statement to Briscoe does have some favorable probative value for Namauu's credibility, in that having said something similar twice makes it marginally more believable. However, the probative value of Namauu's prior consistent statement was minimal when considered in the context of the evidence that had been presented to the jury. Here, there was no dispute that Namauu's prior inconsistent statements to his mother and aunt were a lie, and the jurors heard Namauu's explanation for why he made those statements. Further, the prosecutor did not assert that Namauu's testimony regarding self-defense was recently fabricated.

Given the state of the evidence, that Namauu made a consistent statement to his former attorney Briscoe before making his undisputedly untruthful inconsistent statements to his mother and aunt does little to bolster Namauu's credibility overall. The jurors were aware that Namauu had previously been accused and convicted of shooting at Sureños in 2013 and had made various and conflicting statements to police about the incident. That Namauu, soon after another shooting of a presumed Sureño, told his attorney he had acted in self-defense could reasonably be received by jurors with skepticism. Further, if a juror were to believe Namauu's explanation that he did not want to worry his mother by admitting that he had fired a gun, then it would be reasonable for the juror to conclude that Namauu would not have told his mother that he acted in self-defense, even if true. On the other hand, if a juror were generally inclined to disbelieve Namauu's claim of self-defense, then having made another statement about self-defense could reasonably be viewed as Namauu having told yet another lie. At bottom, Namauu's statement to Briscoe soon after the crime occurred did not have significant probative value in the context of his and his mother's testimony, particularly as the prosecutor did not argue the Namauu had recently fabricated his claim of self-defense.

Furthermore, the trial court reasonably concluded that admission of Briscoe's proposed testimony would result in undue consumption of time. Although the scope of cross-examination is bounded by the witness's direct testimony (Evid. Code, §§ 761,

36

773), the complete waiver of the attorney client privilege offered by Namauu would have provided an opportunity for the prosecutor to question or call Briscoe as her own witness. The prosecutor might have sought to present evidence regarding, for example, statements Namauu made to Briscoe about the 2013 crime. (See *People v. James* (1976) 56 Cal.App.3d 876, 886–887.) In addition, the prosecutor could have properly cross-examined Briscoe on matters relevant to Briscoe's own credibility. (Evid. Code, §§ 210, 780, subd. (f).) Thus, we see nothing arbitrary or absurd in the trial court's conclusion that an undue amount of time would have been required if Briscoe had testified.

Therefore, we decide the trial court did not abuse its discretion by precluding Namauu from presenting the testimony of his former attorney. We further conclude that the trial court's proper exercise of discretion did not violate Namauu right to present a complete defense because the proposed testimony had limited probative value and related to a subsidiary issue of credibility. We thus reject Namauu's claim of error with respect to the exclusion of Briscoe's testimony.

D. *Preclusion of Photos of the Victim with Suspected Gang Members*

Namauu contends that the trial court prejudicially erred and violated his right to present a defense "when it precluded him from introducing photographs of Sam Weinberg holding knives while in the company of suspected gang members." (Capitalization omitted.) Thomas joins Namauu's argument in full.

1. Additional Background

Michael Cook testified that he knew Weinberg to be a wannabe gang banger who always wore blue. Other testimony and several photographs demonstrated that Weinberg associated with Sureño gang members, dressed like them, and displayed hand signs.

During trial, the parties and trial court discussed the admissibility of certain photos of Weinberg. The prosecutor acknowledged that Weinberg "presented himself as if he was a Sure[ñ]o" on the day he was killed. Further, the trial court noted that photos of Weinberg wearing blue, associating with Sureños, and making gang signs were relevant,

37

but the court had to consider their admission under Evidence Code section 352 and whether particular photos were cumulative.

Namauu requested to introduce "some pictures of Mr. Weinberg showing a knife" that had been found on Weinberg's computer (i.e., defense exhibits E and P). Based on descriptions in the record, those two exhibits purportedly depicted Weinberg with other men who looked like Sureños. They were all wearing black. One person held a gun; another held a bat; and one or more was displaying gang signs. Weinberg was holding a knife and wearing a Santa Cruz hat and a bandana over his face.

Namauu argued in the trial court that evidence of Weinberg holding a knife was "critical to the defense case" because it showed Weinberg with "a weapon very similar in nature" to the one "he brandished on the night of the incident." Namauu further asserted that the evidence "depicts [Weinberg's] involvement with Sure[ñ]o criminal street gangs to the point that . . . he would be expected to . . . engage in violence if he felt disrespected or that he wanted to establish . . . his position within the gang or within the community." Namauu also argued that the photos were relevant to Weinberg's "motive and intent" during the April 3, 2015 incident. The prosecutor questioned whether the person holding a knife in exhibit P was Weinberg, saying she did not think it was "so obvious that the individual with the knife is Mr. Weinberg."

During an earlier session of the trial, the trial court had excluded defense exhibit E as significantly more prejudicial than probative. The court did not change its prior ruling when Namauu made his subsequent request to admit defense exhibits E and P. In addition, the trial court concluded that exhibit "P will not be in, from [an Evidence Code section] 352 perspective." The court, however, granted Namauu's request to have the excluded photographs authenticated so he could question Detective Martin about them in relation to assessing a person's connection to a gang.

Later, while Namauu was cross-examining Detective Martin, Namauu again sought permission to either admit certain excluded photographs of Weinberg or use them

38

to challenge Martin's conclusion that Weinberg was not an active Sureño. The trial court held a hearing on Namauu's request pursuant to Evidence Code section 402. Namauu presented several photographs to Martin for his review (including defense exhibits E and P), and Martin maintained that the photos did not change his opinion that Weinberg was only a Sureño associate. Martin also testified that he could not recognize Weinberg in defense exhibits E and P. In response to this testimony, Namauu argued to the trial court that the photos in which Weinberg was "not necessarily recognizable are nevertheless probative of [his] motive and intent on the night of the incident" "to garner the respect and acknowledgement within the gang community of being a tough guy."

The trial court ruled that it would admit some additional photographs that were relevant to Detective Martin's testimony about whether Weinberg were an actual Sureño. However, the court still refused to admit the photographs that showed "knives and guns or masks."

The next day, Namauu asked the trial court to permit him to cross-examine Detective Martin using the various excluded photographs, even though they would not be admitted into evidence. The trial court rejected Namauu's request and precluded any reference to photographs that the trial court had excluded from evidence.

### 2. Legal Principles

" 'It has long been recognized that where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible.' [Citations.] Under Evidence Code section 1103, such character traits can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence." (*People v. Wright* (1985) 39 Cal.3d 576, 587; see also *People v. Smith* (1967) 249 Cal.App.2d 395, 404.)

"Evidence Code section 1101, subdivision (a) provides that 'evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion.' Evidence Code section 1103,

39

subdivision (a)(1) provides an exception to Evidence Code section 1101, subdivision (a) when a defendant offers evidence regarding the character or trait of a victim 'to prove conduct of the victim in conformity with the character or trait of character.' Of course, the trial court may exclude otherwise admissible evidence pursuant to Evidence Code section 352 if admitting the evidence would have confused the issues at trial, unduly consumed time, or been more prejudicial than probative." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828.) The trial court's exclusion of evidence under Evidence Code sections 1103 and 352 is reviewed for abuse of discretion. (*Id*. at p. 827.)

### 3. Analysis

Namauu claims the trial court abused its discretion by refusing "to admit photographs of Sam Weinberg holding a knife." He asserts that any question whether Weinberg appeared in the photos was "a question of weight for the jury and not a reason to exclude the photographs altogether." Namauu further contends that "[i]f Sam Weinberg was in fact the person in the photograph holding a knife in the company of other Sure[ñ]os members," that evidence would be highly relevant to Namauu's self-defense claim, because the "central question in this case was whether Weinberg was in fact holding something in his hands in what could be perceived as a threatening manner." In addition, Namauu maintains that Weinberg's appearance in a photo holding a knife with Sureños "suggest[s] a degree of aggressiveness" and a possible "penchant for violence."

Before we determine whether the trial court erred by excluding defense exhibits E and P, we address the Attorney General's contentions regarding forfeiture. The Attorney General asserts that Namauu forfeited his current claim that the trial court's ruling violated his constitutional right to present a defense because, at trial, Namauu failed to press this constitutional violation. Although Namauu did not mention his constitutional right to present a defense to the trial court, we conclude the application of forfeiture to his

current constitutional claim is unnecessary.[25]  (See *Cowan*, *supra*, 50 Cal.4th at p. 464, fn. 20; *Ervine*, *supra*, 47 Cal.4th at p. 771, fn. 12.)

The Attorney General further contends that Thomas's joinder in Namauu's appellate argument should be rejected because Thomas failed at trial to join Namauu's request to admit the relevant photographs.  We agree that Thomas forfeited his current challenge to the trial court's ruling by failing to object to it in the trial court and thus reject his joinder of the issue on appeal.  (See *Wilson*, *supra*, 44 Cal.4th at p. 793; *Chism*, *supra*, 58 Cal.4th at pp. 1292–1293; see also *Avila*, *supra*, 38 Cal.4th at p. 582.)

Regarding the merits of Namauu's claim of error, we discern no abuse of discretion in the trial court's decision to exclude the photographs marked as defense exhibits E and P.  Namauu failed to present information affirmatively establishing that the person in the photographs holding a knife was in fact Weinberg.  We are not persuaded by Namauu's argument that the lack of positive identification here is properly considered a question of weight to be decided by the jury.  Rather, we consider the non-identification as relating directly to the relevance and probative value of the photographs.  We do not see how a photograph of an unidentified person holding a knife tends to prove that Weinberg himself had an "aggressiveness" or "penchant for violence."  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [admissibility of third-party culpability evidence requires a link between the third person to the actual perpetration of the crime]; cf. *People v. Gonzales* (1968) 68 Cal.2d 467, 472.)  The identity of the person in the photographs holding a knife is crucial to Namauu's argument, yet he failed to present adequate evidence supporting his assertion that the person depicted in defense exhibits E and P was in fact Weinberg.

Further, even if we assume that it was Weinberg holding the knife in the photographs, we are not convinced that the photographs themselves are evidence of

[25] Because we will review the merits of Namauu's constitutional claim, we do not address his alternative claim of ineffective assistance of counsel.

specific instances of conduct that proved Weinberg had a violent character under Evidence Code section 1103, subdivision (a)(1). Namauu acknowledges being unaware of any precedent addressing the admissibility of "mere possession of a weapon" as qualifying as a specific act within the meaning of Evidence Code section 1103. Nevertheless, Namauu maintains that the two photographs of Weinberg holding a knife are admissible because "Namauu's claim was only that Weinberg was holding the knife in what looked like an aggressive manner," and "Namauu testified that he mistook the knife for a gun." Namauu's assertion regarding his claim and testimony are belied by the record.

Although Namauu's trial counsel ultimately argued to the jury that the question before them was "is it reasonable that [Namauu] mistakes that knife for a gun," Namauu did not testify he mistook a knife for a gun. Namauu testified he shot Weinberg "[b]ecause he pointed a *firearm* at me."[26] (Italics added.) On cross-examination, Namauu reaffirmed that he saw Weinberg holding a gun, saying "I'm sure that I seen [*sic*] a gun," and "I still believe it was a firearm. I'm not concerned about it not matching up to the knife in the door, no." In our view, the record does not support Namauu's current assertion about him having mistaken a knife for a gun, and therefore we are not persuaded that defense exhibits E and P were relevant and admissible under Evidence Code section 1103. (See *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446–448.)

Furthermore, regardless whether exclusion of the photographs was appropriate under Evidence Code section 1103, the trial court acted within the bounds of reason when it ruled against Namauu under Evidence Code section 352. The probative value of these

---

[26] Namauu also told the jury that he had been "[o]ne hundred percent" certain that he had seen a firearm on the day he shot Weinberg. He further said that after hearing the trial evidence, he became "[s]eventy-five percent" certain he saw "an actual firearm," i.e., a "firearm that fires bullets," as compared to "an air soft pistol" that was found in the back of Weinberg's SUV. Namauu testified that he felt "bad" "someone died" and he "now [] see[s] the evidence that [Weinberg] had an air soft pistol."

photos was exceedingly minimal in light of the ambiguity about the identity of the person holding the knife. For example, Detective Martin testified at the Evidence Code section 402 hearing that he did not recognize the person as Weinberg.

Moreover, we perceive no error in the trial court's implicit finding that someone who may or may not be Weinberg is holding a knife while posing for a picture with possible gang members would have been prejudicial, confusing, or misleading in the context of the other evidence that was presented to the jury. The prosecution's case showed that Weinberg was a Sureño wannabe/associate who did not have a weapon in his hands at the time Namauu shot him. Further, there was a knife under a tissue in the door pocket of the driver's side of Weinberg's SUV. As for the defense evidence that followed Namauu's request to admit defense exhibits E and P, the lynchpin of that presentation was Namauu's own testimony that he saw Weinberg pointing a gun at him, not a knife.

For these reasons, we conclude that the trial court did not abuse its discretion by excluding the two photographs Namauu sought to introduce. We further conclude that the trial court's proper exercise of discretion did not violate Namauu's right to present a complete defense. (See *Cunningham*, *supra*, 25 Cal.4th at pp. 998–999.) We thus reject Namauu's claim of error with respect to the exclusion of the two photographs.

E. *Admission of Rap Lyrics*

1. Additional Background

Prior to trial, the prosecution brought a motion in limine seeking admission of evidence that the West Side Santa Cruz Norteño gang is a criminal street gang within the meaning of section 186.22, subdivision (f). Among other items, the prosecution sought to admit "[g]ang lyrics written by [Thomas and Namauu]." In a pretrial motion in limine, Thomas requested that the trial court bifurcate the gang charges from the other charged crimes and allegations based on "the extremely prejudicial nature of the gang evidence in this case." Although Thomas's motion did not mention the gang lyrics specifically, the

43

supplemental gang report about Thomas and Namauu produced by the Santa Cruz Police Department that was attached to Thomas's motion included a photocopy of a notebook— later referred to by the parties and the court at trial as the "composition book"— containing rap lyrics found in a search of Namauu's bedroom. The report states "[t]he lyrics suggest they are from Namauu stating he is from Hawaii but he is now in Santa Cruz representing the Westside Santa Cruz. He speaks of killing people on the street with guns."

At trial, Detective Damon Williams testified that on April 4, 2015, he conducted a parole search at 873 Nobel, where Namauu was living. Williams identified a composition book that he had found in a blue nightstand in Namauu's room. The composition book contained about 20 pages of rap lyrics. Namauu objected to admission of the composition book as cumulative and violative of Evidence Code section 352.

The trial court found the 33-page composition book cumulative and excluded it. In response, the prosecution excerpted 13 pages from the composition book, redacted them, and offered the redacted excerpts into evidence. Namauu again objected to admission of the excerpts from the composition book as cumulative and in violation of Evidence Code section 352.[27] In support of its admissibility, the prosecutor referenced arguments she had made earlier with respect to Thomas's objection to admission of his own rap lyrics. She had argued the lyrics were relevant to intent and motive for the

---

[27] Thomas also objected to its admission and renewed arguments he had previously made with respect to admission of his own rap lyrics. Thomas had objected on relevance grounds to admission of gang lyrics found on his cell phone. Thomas had argued they discussed guns and drug dealing but nothing about Sureños or shooting Sureños. Thomas had asserted the lyrics were not admissible under Evidence Code section 1101 and amounted solely to inadmissible bad character evidence. Thomas had also contended they should be excluded under Evidence Code section 352 as unfairly prejudicial. The prosecution responded that the lyrics were relevant to Thomas's intent with respect to the murder and therefore admissible under Evidence Code section 1101, subdivision (b). In addition, the prosecution contended that the lyrics were circumstantial evidence that Thomas was involved in gangs and specifically with West Side Santa Cruz.

murder and had contended they were circumstantial evidence that the defendant was involved in gangs and specifically with West Side Santa Cruz.[28]

The trial court admitted the 13 pages from the composition book. It found that the 13 pages (unlike the original 33-page exhibit) were not cumulative, were probative, and were not significantly more prejudicial than probative. The court noted that the relevance of the pages would be "tied together" by the gang expert witness and found that they would not confuse the jury.

Detective Martin, the prosecution's expert witness on criminal street gangs, testified about the meaning of the lyrics in the excerpts from Namauu's composition book.[29] Martin relied in part on the rap lyrics when reaching the opinion that Namauu was a member of the West Side Santa Cruz gang. Martin observed that they included "common theme[s]" of carrying a gun and shooting people. Some lyrics referenced selling drugs and a few described "west side or West Cliff" and "throwing four fingers."[30] Martin stated a lyric describing a partner in the backseat "trained to go and clap fo [sic] me" meant "[t]o shoot for him."

Martin described other lyrics from the composition book as references to the commission of robberies, loyalty to the gang, killing rival gang members, protection of gang territory, and the gang code against "snitching." With respect to a different lyric, Martin testified the words signified "glorifying shooting and killing people." On one of the pages, Martin identified a symbol for the West Side Santa Cruz gang. Martin stated that the lyric "west siding" was a reference to Namauu's affiliation with the West Side

---

[28] See footnote 27, *ante*.

[29] Martin also testified about the meaning of rap lyrics found in Namauu's jail cell, but Namauu on appeal objects only to the admissibility of the lyrics from the composition book.

[30] Martin testified that throwing up four fingers is a gesture associated with West Side Santa Cruz.

Santa Cruz gang. On cross-examination, Martin acknowledged that there is a genre of music entitled "gangster rap" that has significant gang overtones.

In his own testimony, Namauu stated that he wrote the rap lyrics contained in the composition book while in prison in 2013 and 2014. He was trying to express with the lyrics "how it is in Santa Cruz," and they represented his experience there. Namauu acknowledged that in his rap lyrics when he said "no chest shots" it was because chest shots are not good shots because they are not deadly. His rap lyrics about hollow point bullets referred to his own experience with his 2013 crime, in which he used a gun containing hollow point bullets. Namauu denied that his reference to "rep[ing]" West Side Santa Cruz in his rap lyrics referred to his membership in the West Side Santa Cruz criminal street gang. Namauu stated he raps "about a lot of stuff that is not true" and described his rap lyrics as "made-up stories."

2. Summary of Namauu's Argument and Relevant Legal Principles

Namauu argues the trial court abused its discretion under Evidence Code section 352 and violated his constitutional right to due process when it admitted rap lyrics from his composition book. In particular, Namauu argues the "mere artistic expression" of his rap lyrics amounts solely to propensity evidence having a tendency to cause jurors to view him as a bad person that is not probative of his behavior. Namauu further argues that the content of this lyrics, including their references to gun violence and drugs, was unfairly prejudicial.

Namauu maintains that admission of the rap lyrics violated his right to due process because there were no permissible inferences the jury could draw from the evidence, and the lyrics showed only that Namauu "had a penchant for violence." Namauu urges this court to follow the analysis in *State v. Skinner* (N.J. 2014) 95 A.3d 236 (*Skinner*), in which the New Jersey Supreme Court affirmed the reversal of a conviction for attempted murder, finding that "the violent, profane, and disturbing rap lyrics authored by defendant constituted highly prejudicial evidence against him that bore little or no probative value

46

as to any motive or intent behind the attempted murder offense with which he was charged." (*Id*. at p. 238.)

Namauu argues this court should reject the reasoning of cases such as *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*) and *People v. Zepeda* (2008) 167 Cal.App.4th 25, which upheld under California law the admission of rap lyrics. Namauu maintains that the erroneous admission of the lyrics was prejudicial because it was reasonably probable that they affected the jury's consideration of his self-defense claim. On appeal, Thomas has not joined in Namauu's objection to the admission of rap lyrics at trial.

We have set out above[31] the general legal principles applicable here—that only relevant evidence is admissible, and a court enjoys broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. (*Merriman*, *supra*, 60 Cal.4th at p. 74.) We review the trial court's rulings on relevancy and admissibility under Evidence Code section 352 for abuse of discretion. (*Merriman*, at p. 74.)

" ' "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' ." ' " (*Jones*, *supra*, 57 Cal.4th at p. 948.) " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Id*. at p. 949.)

---

[31] See section II.A.2., *ante*.

### 3. Analysis

The crux of Namauu's argument is that his rap lyrics were solely an artistic expression from which the jury could draw no legitimate permissible inference of guilt.[32] Namauu relies in particular on the decision of the New Jersey Supreme Court in *Skinner*, *supra*, 95 A.3d 236. However, that case is distinguishable on its facts. In *Skinner*, the court emphasized there was no evidence that the defendant had engaged in any of the events described in his rap lyrics and observed that the prosecution had presented no evidence undermining the conclusion that "[t]he lyrics can only be regarded as fictional accounts." (*Id.* at p. 251.) Here, by contrast, Namauu testified that at least some of the rap lyrics reflected his own experience of "how it is in Santa Cruz." Furthermore, Namauu stated that certain details in his rap lyrics reflected the details of his 2013 conviction. It is true that Namauu also testified that the rap lyrics were fictional. However, the jury was entitled to resolve this conflict in the evidence against Namauu, and "[t]he existence of benign explanations does not stand as a bar to admissibility." (*People v. Nelson* (2011) 51 Cal.4th 198, 224.) Therefore, unlike the lyrics in *Skinner*, there was substantial evidence from which the jury could infer that Namauu's lyrics did not amount solely to artistic expression.

Indeed, there was substantial evidence that Namauu's rap lyrics were probative of his membership in the West Side Santa Cruz criminal street gang. Detective Martin, the prosecution's gang expert, testified that Namauu's lyric about "west siding" was a reference to Namauu's affiliation with the gang. In his own testimony, Namauu denied this link and stated that he was not part of the West Side gang. Therefore, Namauu's relationship to the gang was a disputed factual question, for which Namauu's rap lyrics

---

[32] Namauu contends that, if we find his evidentiary objection forfeited, that his trial counsel was ineffective for failing to preserve the objection. As trial counsel did object to admission of the relevant rap lyrics and lodged an objection under Evidence Code section 352, this issue is preserved for appeal. We therefore do not reach his claim of constitutionally ineffective counsel.

held probative value. And the jury was entitled to disbelieve Namauu's description of his rap lyrics in favor of Martin's interpretation of them. We may not revisit that factual issue on appeal.

Further, Namauu's gang affiliation went to the prosecution's theory of Namauu's motive for the killing, and "[a] trial court has wide latitude to admit evidence relevant to motive." (*People v. Johnson* (2019) 32 Cal.App.5th 26, 62.) Where, as here, a crime is alleged to be gang related, "evidence tending to show" gang membership is "highly relevant." (*Olguin*, *supra*, 31 Cal.App.4th at p. 1373.)[33] For these reasons, we decide no violation of Namauu's due process rights occurred in the admission of the excerpts from his composition book.

We also disagree with Namauu's contention that the trial court erred when it found the excerpts from the composition book were not unfairly prejudicial. Under Evidence Code section 352, the trial court exercises broad discretion in making this determination, and we may not disturb it on appeal " 'except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Olguin*, *supra*, 31 Cal.App.4th at p. 1373, italics omitted.) The record demonstrates that the trial court carefully considered the content of the composition book, its relevance to the charges, and its relationship to other evidence. The trial court excluded the entire composition book and admitted excerpts from it only after the prosecution had redacted certain portions and proffered their relevance to the testimony of the gang expert. On this record, we cannot conclude the trial court abused its discretion in admitting this evidence. We therefore reject Namauu's challenges to admission of his rap lyrics from the composition book.

---

[33] We decline Namauu's invitation to depart from this longstanding precedent upholding the admissibility of rap lyrics in gang-related prosecutions.

F.  *Cumulative Error*

Namauu contends the cumulative effect of the five alleged constitutional errors related to the admission or exclusion of certain evidence that we have addressed *ante* prejudiced him and requires reversal.  Thomas joins Namauu's argument.[34]

Because we find no error, there is no error or prejudice to cumulate.  (See *People v. Duff* (2014) 58 Cal.4th 527, 562.)

G.  *Thomas's Motion to Suppress Evidence*

Thomas contends the trial court erred by denying his motion to suppress evidence seized during three warrant-based searches and a pat search of his person and backpack. Two of the three challenged searches occurred at Thomas's apartment on December 19, 2013 and December 20, 2013, and were related to a crime his father, John Thomas Jr. (John Thomas), had committed.  The pat search of Thomas occurred outside the apartment during the search on December 19, 2013.  The third search of Thomas's apartment and car occurred on April 4, 2015 and was related to the current crime.

We will begin by describing the procedural background for Thomas's suppression motion.  We next will analyze Thomas's claim of error, discussing relevant facts for each search concurrently with our analysis.

1.  Procedural Background

Thomas filed a generic motion under section 1538.5 to suppress all physical evidence and testimony resulting from illegal detentions or arrests of Thomas or from illegal searches of his home, vehicles, person, or effects, with or without a warrant.

Later, Thomas filed a supplement to his suppression motion, adding factual background and specificity to his arguments.  As relevant here, Thomas sought to

---

[34] We note that Thomas did not join the claims addressed in sections II.A. and II.E., *ante*.  Further, we have concluded that Thomas forfeited the claims addressed in sections II.C. and II.D., *ante*.  Thus, there are no claims for Thomas to cumulate with the only claim Thomas properly preserved for appeal, i.e., the claim addressed in section II.B., *ante*.

50

suppress evidence related to: (1) a search of an apartment that Thomas shared with his father, John Thomas, pursuant to a search warrant executed on December 19, 2013; (2) a detention and pat search of Thomas outside his apartment on December 19, 2013; (3) a search of Thomas's apartment pursuant to a search warrant executed on December 20, 2013; and (4) a search of Thomas's apartment and car pursuant to a search warrant executed on April 4, 2015.

The prosecutor filed a written opposition to Thomas's suppression motion, and Thomas replied to the opposition.

The trial court held a pretrial hearing on Thomas's motion. The parties stipulated to the facts as presented in their motion papers related to the contested searches. Thomas argued that there was no probable cause for a warrant to search his apartment on December 19, 2013, because the supporting affidavit was speculative and did not sufficiently establish that evidence of a crime would be found at the apartment. Thomas argued further that the detention and pat search conducted upon his arrival outside the apartment during the search were unlawful because he did not do anything to threaten the police officers or interfere with their search. Thomas maintained the December 20, 2013 search was improperly based on the first illegal search of his apartment and the illegal detention and pat search. As for the search conducted on April 4, 2015, Thomas argued the warrant was invalid because the issuing magistrate intentionally failed to sign it. Thomas also argued that the warrant was based in part on the illegal searches conducted in December 2013 and was otherwise not supported by probable cause. The prosecutor submitted the matter on her written opposition, and the trial court tentatively denied Thomas's suppression motion.

Later, the trial court adopted its tentative ruling. The court concluded the search warrant for the December 19, 2013 apartment search was supported by probable cause. Further, the court found "that the detention of Defendant Thomas at [the apartment] was appropriate under all of the circumstances and the pat search was appropriate under all

51

circumstances."[35]  As for the April 4, 2015 search, the court stated, "I do not find that the failure of [the magistrate] to sign the warrant is fatal to its validity.  I think it's clear that law enforcement relied upon that search warrant in good faith."

### 2. Legal Principles

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719 (*Redd*).)

A defendant may move to suppress evidence on the ground that a warrantless search or seizure was unreasonable or that a search or seizure with a warrant was unreasonable.[36]  (§ 1538.5, subds. (a)(1)(A) & (B).)  "A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search." (*Redd*, *supra*, 48 Cal.4th at p. 719; see *People v. Bower* (1979) 24 Cal.3d 638, 644; *People v. Johnson* (2006) 38 Cal.4th 717, 729.)

"The Fourth Amendment to the United States Constitution prohibits seizures of persons, including brief investigative stops, when they are 'unreasonable.' [Citations.] Our state Constitution has a similar provision. [Citation.] A seizure occurs whenever a police officer 'by means of physical force or show of authority' restrains the liberty of a person to walk away." (*People v. Souza* (1994) 9 Cal.4th 224, 229.)

In *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*), the United States Supreme Court held that the United States Constitution permits "a reasonable search for weapons for the

---

[35] Because Thomas's challenge to the December 20, 2013 apartment search was conditioned on the invalidity of the December 19, 2013 search and the related detention and pat search of Thomas, the trial court impliedly found that the December 20, 2013 search also was valid.

[36] " 'In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards.' " (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212.)

protection of the police officer, where [the officer] has reason to believe that he [or she] is dealing with an armed and dangerous individual." (*Id*. at p. 27.) A pat search is justified if "a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." (*Ibid*.) "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." (*Ibid*.) "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the search. (*Id*. at p. 21.)

"The pertinent rules governing a Fourth Amendment challenge to the validity of a search warrant, and the search conducted pursuant to it, are well-settled. 'The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' [Citations.] 'The test for probable cause is not reducible to "precise definition or quantification." ' [Citation.] But . . . it is ' "less than a preponderance of the evidence or even a prima facie case." ' [Citation.] ' "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him [or her], . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." ' [Citations.] 'The magistrate's determination of probable cause is entitled to deferential review.' [Citations.] . . . [T]he warrant 'can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence' supporting the finding of probable cause." (*People v. Westerfield* (2019) 6 Cal.5th 632, 659–660.) "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be

53

accorded to warrants." (*United States v. Ventresca* (1965) 380 U.S. 102, 109; see also *People v. Weiss* (1999) 20 Cal.4th 1073, 1082–1083.)

"[W]hen . . . the police do obtain a warrant, that warrant is presumed valid. (*People v. Amador* (2000) 24 Cal.4th 387, 393; see also *People v. Panah* (2005) 35 Cal.4th 395, 456 [" ' "[T]here is a presumption of validity with respect to the affidavit." ' "].) "Because a search conducted pursuant to a search warrant is presumed lawful, the burden of establishing the invalidity of the search warrant rests upon the defendant." (*People v. Lazalde* (2004) 120 Cal.App.4th 858, 865; *Amador*, at p. 393.)

"In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his [or her] judgment that the form of the warrant is technically sufficient." (*United States v. Leon* (1984) 468 U.S. 897, 921 (*Leon*).) "In *Leon*, the Supreme Court held that when 'an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope,' the 'marginal or nonexistent benefits' produced by suppressing the evidence obtained 'cannot justify the substantial costs of exclusion.' [Citation.] '[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates.' [Citation.] Therefore, suppression of evidence is an appropriate remedy only if 'the magistrate or judge in issuing [the] warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth,' the affidavit is ' "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," ' or the affidavit is so deficient in particularizing the place to be searched or the things to be seized that the executing officer 'cannot reasonably presume it to be valid.' [Citation.] In considering the issue, we apply the objective test of ' "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." ' [Citations.] We review the trial court's application of the good faith exception de novo." (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 766–767 (*Lazarus*).)

3. Analysis

a. December 19, 2013 Apartment Search

On December 18, 2013, John Thomas (appellant Thomas's father) committed attempted carjackings and an attempted murder. Witnesses described him pulling the trigger of a silver pistol several times, unsuccessfully trying to fire it. Soon after, John Thomas was arrested nearby; he was unarmed. The next day, officers searched the area around where John Thomas had been arrested and found a silver .38 caliber revolver behind a bush. The revolver was loaded with live .380 caliber ammunition. The ammunition, however, could not be fired from the revolver because it was too short for that gun.

On the afternoon of December 19, 2013, police obtained and executed a search warrant for John Thomas's apartment. The property seized included many items indicative of gang activity, .380 caliber and 9mm ammunition, and several cell phones.

On appeal, Thomas contends that the warrant for the apartment lacked probable cause because John Thomas committed the crimes at a different location and " '[m]ere evidence of a suspect's guilt provides no cause to search his residence.' " He argues further that "there was nothing in the search warrant affidavit to support any inference that evidence of criminal conduct would be found inside [Thomas's apartment]." In addition, Thomas contends that "there is no basis for applying the good faith exception to the exclusionary rule in this situation."

We are not persuaded by Thomas's arguments. The warrant application established probable cause to search the apartment John Thomas shared with his son, appellant Thomas. There was a substantial basis to conclude that evidence tying John Thomas to the recovered revolver and its mismatched .380 caliber ammunition would probably be found at his apartment. In addition, the warrant affidavit declared that John Thomas was currently on parole and a member of the West Side Santa Cruz and "Kumi 415"/"Kumi" criminal street gangs. Given the totality of the circumstances, the issuing

magistrate could appropriately authorize officers to search for and seize gang-related evidence in John Thomas's apartment. That evidence would support a gang charge and enhancements against John Thomas. For these reasons, we conclude the search warrant was valid. (See *Illinois v. Gates* (1983) 462 U.S. 213, 238–239 (*Gates*).) Further, even assuming that the warrant was not based on probable cause, the officers could have, in good faith, reasonably believed that it was. (See *Leon*, *supra*, 468 U.S. at p. 922; *United States v. Crews* (9th Cir. 2007) 502 F.3d 1130, 1136–1137.)

### b. December 19, 2013 Detention and Pat Search

When police officers executed the search warrant on December 19, 2013, they handcuffed three individuals who were inside John Thomas's apartment and took them outside. During the search, Thomas arrived at the apartment and walked toward Detective Martin and the detained individuals. Thomas was wearing a "YOLO" sweatshirt. Martin recognized the sweatshirt as matching the description of one worn by a perpetrator of an unsolved armed robbery that had occurred a few months earlier. Detective "Martin walked toward [appellant] Brandon Thomas and stopped him from coming closer 'into the scene.' "

Detective Martin decided to pat search Thomas because Martin's role was to secure the search scene and the detainees; Martin knew that Thomas was a person of interest in multiple armed robberies; Thomas was wearing baggy clothes; and Thomas had approached the secured " 'safety zone' " of the search. Martin turned Thomas so that he faced a wall. As Martin pat searched Thomas from behind, Martin touched Thomas's backpack and felt a handgun. Martin handcuffed Thomas, removed the backpack from Thomas's back, searched it, and found a loaded 9mm pistol. The backpack had "WSSC" (for the West Side Santa Cruz criminal street gang) written on the inside.

Thomas contends on appeal that the December 19, 2013 detention and search were illegal for three reasons: (1) "it was a direct product of the execution of a search warrant . . . that was not supported by probable cause;" (2) "the subject matter underlying that

search warrant did not authorize a search for contraband or some type of substance or item that was illegal to possess;" and (3) "independent of the above arguments, . . . the pat[]down search of [Thomas] and his backpack was illegal" because there were no specific and articulable facts supporting a belief that Thomas "was armed and presently dangerous to the officer or to others."

The Attorney General responds that Thomas forfeited his right to challenge the detention and pat search because Thomas "could have moved to suppress the firearm in 2013, before he was convicted of possession of a concealed firearm." The Attorney General maintains that Thomas "either exercised that right and lost—in which case the admission of the evidence was the law of the case. Or he failed to make the motion because he knew he did not have a compelling argument. Either way, Thomas waived his right to challenge the validity of the seizure years later in an unrelated case."

We note that the prosecutor at trial failed to make any such arguments, and the record does not indicate whether Thomas did or did not move to suppress the evidence during the prosecution that resulted in Thomas's March 17, 2014 conviction for carrying a concealed firearm on December 19, 2013. In this circumstance, however, the prosecutor's failure to assert the above-described grounds for denying Thomas's suppression motion does not preclude the People from now asserting those grounds. (See *Green v. Superior Court* (1985) 40 Cal.3d 126, 138–139.) Because Thomas presumably had an opportunity and incentive to suppress the seized evidence in his earlier prosecution, we conclude that Thomas's challenge to the December 2013 detention and pat search in his current case was either forfeited by his failure to raise the issue in the earlier prosecution or otherwise precluded because he asserted an issue that could not be relitigated in the current case. (*People v. Enos* (1973) 34 Cal.App.3d 25, 39–40 (*Enos*).)

Even assuming arguendo that Thomas's challenge to the detention and pat search can be considered by this court in this appeal, we discern no reason to conclude that Detective Martin's actions were illegal. As discussed, *ante*, the December 19, 2013

search warrant was valid. Further, we reject Thomas's argument that detaining him as he approached the apartment was unlawful in relation to the execution of the search warrant. There was no dispute that Thomas lived at the place being searched and walked up to the secured area. Thus, police appropriately restrained him and prevented him from entering the search area. (See *People v. Glaser* (1995) 11 Cal.4th 354, 374; *Michigan v. Summers* (1981) 452 U.S. 692, 705; *Muehler v. Mena* (2005) 544 U.S. 93, 98; *Bailey v. United States* (2013) 568 U.S. 186, 200–201.)

Notwithstanding our rejection of Thomas's first two arguments, we also decide that Detective Martin's detention and pat search of Thomas were supported by a reasonable articulable suspicion that Thomas may have been armed. Detective Martin knew that Thomas was a possible suspect in several armed robberies, was wearing baggy clothing connected to one of those robberies and approached the secured " 'safety zone' " possessing a backpack. Martin's conduct in detaining and pat searching Thomas and his backpack was legally permissible. (See *Terry*, *supra*, 392 U.S. at p. 21.)

c. December 20, 2013 Apartment Search

The police executed a second warrant at Thomas's apartment just after midnight on December 20, 2013. The search followed Thomas's arrest for possession of a concealed firearm. The primary purpose of the search was to find gang indicia, firearms, and ammunition.

Thomas contends on appeal that "everything seized in connection with the second search warrant . . . was illegally obtained since" it was based on information and observations from the earlier, allegedly invalid first apartment search and detention and pat search of Thomas. He further argues that without the "information and observations unlawfully derived from the earlier search . . . [and] the unlawful detention and pat down search . . ., there would have been no probable cause to support the second search warrant."

58

We reject Thomas's arguments.  As a threshold matter, Thomas cannot complain in the current prosecution about a search that he could have challenged or may have unsuccessfully challenged in the earlier prosecution stemming from his arrest for possession of a concealed firearm.  (*Enos*, *supra*, 34 Cal.App.3d at pp. 39–40.)  In any event, for the reasons discussed *ante*, the December 19, 2013 search warrant was valid, and the detention and pat search of Thomas were legal.  For these reasons, Thomas's claim challenging the December 20, 2013 apartment search fails.

### d.  April 4, 2015 Apartment and Car Search

Thomas contends that the search warrant issued on April 4, 2015, for his apartment and car in relation to the current crime, was unlawful for two reasons.  First, he argues that the warrant was not supported by probable cause.  Second, he asserts that the search warrant was defective because the issuing magistrate intentionally failed to sign the warrant at the time it was sought and then, two days later, signed it and back dated the signature.

Regarding probable cause, Thomas concedes that the information in the search warrant affidavit showed that he "was an aider and abettor in a homicide that occurred at the intersection of River Street and North Pacific Avenue and that [he] lived at [the] apartment" the police sought to search.  But he claims—like he did when challenging the first December 2013 search warrant—that evidence of a crime committed away from home does not provide cause to search the perpetrator's home.  Thomas further asserts that "the lack of probable cause is particularly true when all of the statements in the search [warrant] affidavit" pertaining to the two December 2013 apartment searches and the December 2013 detention and pat search are excised from the affidavit.

We are not persuaded that the magistrate issued the search warrant without probable cause.  For the reasons discussed previously, there was nothing illegal about the December 2013 apartment searches or the detention and pat search.  Thus, information derived from those searches was properly considered by the magistrate when issuing the

59

April 4, 2015 warrant.  Furthermore, the information in the search warrant affidavit provided a substantial basis to conclude that there was a fair probability contraband or evidence of a crime would be found in Thomas's apartment and car.  The affidavit, inter alia:  described the crime in detail, noted Michael Cook's identification of Thomas and Namauu, included still pictures of Thomas from surveillance video footage from Lloyd's Liquors, noted that Thomas was then currently on felony probation for possession of a loaded stolen firearm, explained that Thomas and Namauu were close friends and persons of interest in several shootings and robberies that occurred in 2013, noted that Thomas and Namauu had been stopped more than once while driving the car used in the current crime, provided information about Thomas's and Namauu's gang affiliation, and observed that Thomas possessed a loaded firearm in his backpack and had 9mm ammunition in his apartment in December 2013.

Based on all of these circumstances, there was a fair probability that evidence tying Thomas to the murder weapon would be found in his apartment or car.  There also was a fair probability that the clothing Thomas had been seen wearing during the incident would be found in his apartment or car.  The clothing would have confirmed Thomas's involvement and might have contained gunshot residue.  Moreover, it was fairly probable that evidence of Thomas's gang affiliation and connection to Namauu would be found in these locations.  For these reasons, we conclude that the April 4, 2015 search warrant was valid.  (See *Gates*, *supra*, 462 U.S. at p. 238.)  Further, even assuming that the warrant was not supported by probable cause, the officers could have, in good faith, reasonably believed that it was.  (See *Leon*, *supra*, 468 U.S. at p. 922.)

We next turn to Thomas's argument that the search warrant was defective because the magistrate intentionally failed to sign it before it was executed by the police.  The affiant for the April 4, 2015 search warrant, Detective Schonfield, spoke to the magistrate by telephone about the application on Saturday, April 4, 2015.  The magistrate then e-mailed Schonfield, at Schonfield's request.  In the e-mail, the magistrate confirmed

60

having "reviewed the Ramey and Search Warrants and find[ing] probable cause to execute these warrants at any time of day or night." Further, the magistrate wrote, "I have sworn you in and directed you to sign my name now, and to come to the Watsonville Courthouse [] on Monday 4/6/15 . . . with the hard copy for my signature." Later that day, police executed the search warrant at Thomas's apartment and Detective Schonfield left a copy of the warrant that she had signed pursuant to the magistrate's authorization.[37]

Thomas asserts that the magistrate failed to comply with the letter of section 1526, subdivision (b).[38] The Attorney General counters that the magistrate's actions were proper under a different section governing the issuance of "a duplicate original warrant," namely section 1528, subdivision (b).

Even assuming arguendo that the way the magistrate handled this search warrant application failed to comply with the then-current version of section 1526, the asserted errors here were merely technical defects that do not invalidate the warrant. The Fourth Amendment "does not include an express requirement that the magistrate's signature be affixed to the warrant." (*People v. Superior Court* (*Robinson*) (1977) 75 Cal.App.3d 76, 80 (*Robinson*).) "The primary purpose of the [Fourth] Amendment, as has been noted many times, is to require that decisions about the sufficiency and the reliability of evidence used to justify a search be made by a neutral and detached magistrate, rather than by an 'officer engaged in the often competitive enterprise of ferreting out crime.' " (*Ibid.*)

---

[37] The record does not include a copy of the warrant that Detective Schonfield signed pursuant to the magistrate's direction. The only signed warrant in the record is one signed by the magistrate herself, dated April 4, 2015.

[38] We note that the version of section 1526, subdivision (b), quoted in Thomas's suppression motion and appellate brief is not the version of that statute in effect on April 4, 2015—the date the warrant issued. The version of section 1526 in effect on that date was passed by the Legislature in 2010. (See Stats. 2010, Ch. 98, § 1.) The version quoted by Thomas appears to be one passed in 2016. (See Stats. 2016, Ch. 86, § 232.)

In the present case, the record demonstrates that the magistrate found probable cause upon the information provided by Detective Schonfield and clearly directed that a search warrant issue. Pursuant to the magistrate's authorization, Detective Schonfield then signed the warrant and executed it. Based on these facts, the search warrant was valid at the time of its execution. (See *Robinson*, *supra*, 75 Cal.App.3d at pp. 79–80; *Sternberg v. Superior Court* (1974) 41 Cal.App.3d 281, 291; *People v. Sanchez* (1982) 131 Cal.App.3d 323, 328–331.) Furthermore, notwithstanding our conclusion regarding the validity of the warrant, we discern no reason the good faith exception to the exclusionary rule should not apply in this circumstance. (See *Leon*, *supra*, 468 U.S. at p. 922; *Lazarus*, *supra*, 238 Cal.App.4th at pp. 766–767; see also *Robinson*, *supra*, 75 Cal.App.3d at p. 80.)

In sum, we conclude the trial court did not err in its denial of Thomas's suppression motion.

H. *Sufficiency of the Evidence of the Gang's Primary Activities*

Namauu, joined by Thomas, argues insufficient evidence supports his conviction for participation in a criminal street gang, in violation of section 186.22, subdivision (a).

1. Additional Background

Detective Alex Martin had been a police officer with the City of Santa Cruz for 21 years and a gang crimes detective for eight years. He testified at trial for the prosecution as a gang expert. In his work with the Santa Cruz Police Department, Martin had spoken with over 100 gang members. Martin testified that the only Norteño gang operating within the City of Santa Cruz is called West Side Santa Cruz, also known as West Side Chicos. West Side Santa Cruz originated in the early 1980s. One of Martin's responsibilities as a gang detective was to "keep up on gang crimes" committed in Santa Cruz. He read "[e]very report or field interview card or rumor information that is gathered at the Santa Cruz Police Department" about gangs.

Detective Martin opined that Thomas and Namauu were members of and active participants in the West Side Santa Cruz gang. Martin testified that members of the West Side Santa Cruz gang commit assault with deadly weapons, discharge guns from vehicles, carry concealed or loaded firearms, and commit the crimes of robbery, burglary, and murder. With respect to the gang's primary activities, Martin stated that "members that I know of the West Side Santa Cruz gang members and of their arrests and convictions that has happened in the last eight years that I've investigated West Side Santa Cruz these crimes are more frequent in that there's—a majority of them are assaults with deadly weapons, [section] 245, and then there's carrying a concealed firearm, burglaries, drug sales. So based on my knowledge of West Side Santa Cruz gang members and based on my knowledge of the crimes that have been investigated by our police department and myself these crimes are more frequent within Santa Cruz—West Side Santa Cruz gang members." While all of these frequently committed crimes had been investigated by the police, they had not necessarily all resulted in criminal convictions. With respect to his analysis of the West Side Santa Cruz street gang, Martin considered crimes that had occurred from 1996, when he began working at the Santa Cruz Police Department, until the time of trial in 2018.

When determining the West Side Santa Cruz gang's primary activities, Martin "look[ed] at the volume of arrests by members" for the crimes listed in section 186.22, subdivision (e), and determined "how many were assaults with deadly weapons, how many were possession of firearms[,] and so on." Martin included arrests that did not result in convictions but did not consider investigations that did not result in arrests. Martin generally classified as primary activities crimes that resulted in between seven and 11 arrests in the relevant time period. Nonetheless, he considered that there were three homicides, "maybe" four burglaries, and 11 assaults with a deadly weapon committed by members of West Side Santa Cruz during the 22-year period he examined.

Beyond this general information, Martin testified about a conversation he had had with Alejandro Jimenez. Jimenez said he had been a member of the West Side Santa Cruz gang for two years and told Martin that members of West Side Santa Cruz commit robberies and assaults on their gang rivals. Martin testified about an individual named Brandon Garcia who had a tattoo saying West Side Santa Cruz on his body and was convicted of robbery, carrying a concealed firearm, and being an active participant in the West Side Santa Cruz Norteño criminal street gang. Martin stated it was his opinion that Garcia was a member of West Side Santa Cruz in part because West Side Santa Cruz gang members "rob and assault people especially their rivals and in this case that's exactly what he did." Martin testified about additional individuals who he believed were West Side Santa Cruz gang members who had committed assault and murder.

2. Legal Principles

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318.) We review a section 186.22 conviction for substantial evidence, consider the evidence in a light most favorable to the judgment, and presume the existence of every fact that can reasonably be deduced from the testimony. (*People v. Williams* (2009) 170 Cal.App.4th 587, 624; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1224 (*Vy*).) "An appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Rather, before we can set aside a judgment of conviction for insufficiency of the evidence, "it must clearly appear that

upon no hypothesis whatever is there sufficient evidence to support [the jury's finding]." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

"Penal Code section 186.22, also known as the Street Terrorism Enforcement and Prevention Act (the STEP Act or Act), was enacted in 1988 . . . .  The Act imposes various punishments on individuals who commit gang-related crimes." (*People v. Prunty* (2015) 62 Cal.4th 59, 66–67.)  "The STEP Act defines a 'criminal street gang' as an 'ongoing organization, association, or group.' (§ 186.22(f).)  That 'group' must have 'three or more persons,' and its 'primary activities' must consist of certain crimes.  (*Ibid*.)  The same 'group' must also have 'a common name or common identifying sign or symbol,' and its members must be proven to have engaged in a 'pattern of criminal activity' by committing predicate offenses." (*Prunty*, at p. 71.)  Section 186.22, subdivision (e)(1) through (25) and (31) through (33), enumerates the criminal acts, the commission of which must serve as one of the gang's primary activities.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).)  "That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Ibid*.)  The trier of fact may consider "the circumstances of the present or charged offense in deciding whether the group has as one of its primary activities the commission of one or more of the statutorily listed crimes." (*Ibid*.)  "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute." (*Id*. at p. 324, italics omitted.)  Expert testimony also might constitute sufficient proof.  (*Ibid*.)

Namauu and Thomas contend that the prosecution presented insufficient evidence of West Side Santa Cruz's primary activities, because, in their view, the number of crimes the gang expert testified to did not amount to a consistent and repeated

commission of those crimes. In essence, they maintain that 11 incidents over 22 years cannot, as a matter of law, constitute a "primary activity" under section 186.22. The Attorney General argues that Martin testified to "a minimum of 60 crimes" when describing the primary activities of West Side Santa Cruz. Namauu and Thomas and the Attorney General disagree on whether the jury was entitled to aggregate the primary crimes, or whether it had to consider the frequency of each crime separately. However, Namauu and Thomas ultimately concede this dispute is irrelevant—and argue that two or three crimes per year cannot, as matter of law, constitute consistent and repeated criminal activity sufficient to satisfy the primary activities element of section 186.22.

3. Analysis

Namauu and Thomas provide no direct case or statutory support for their claim that 11 crimes over 22 years cannot satisfy the primary activities prong of section 186.22. Even assuming their mathematical summary is accurate (which appears doubtful in light of Martin's testimony) our independent research has similarly failed to locate any authority setting out such an arithmetical test. The statutory text does not further define "primary activities,"[39] and the California Supreme Court has described the element as excluding the "occasional commission" of the enumerated crimes. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323.)

We have reviewed the testimony of Detective Martin. Drawing all inferences in favor of the judgment, we decide that it constitutes substantial evidence from which the jury could conclude (as described in the jury instructions) that West Side Santa Cruz engaged in the primary activities "of murder; assault with a deadly weapon or firearm;

---

[39] Section 186.22, subdivision (f), provides "As used in this chapter, 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."

robbery; discharge of a firearm from a vehicle; witness intimidation; sale, or possession for sale, of methamphetamine, heroin or cocaine; burglary; carrying a concealed firearm; and/or carrying a loaded firearm."

This court has rejected the type of mathematical argument advanced by Namauu and Thomas when reviewing claims of insufficient evidence of primary activities. In *Vy*, *supra*, 122 Cal.App.4th at pp. 1225–1226, a panel of this court stated, "Defendant urges us to look at the entire two-year period of [the gang's] existence in order to conclude that the gang did not '*consistently and repeatedly*' engage in predicate criminal acts. [Citation.] Under the circumstances presented here, however, we reject defendant's invitation to essentially 'spread out' the predicate crimes over [the gang's] entire existence. . . . [T]he fact that [the gang's] level of criminal activity lay dormant for most of its existence does not preclude a finding that it was a gang under the enhancement statute, where there was evidence of consistent and repeated criminal activity during a short period before the subject crime." Another Court of Appeal has decided that use of words like "often" by the gang expert satisfies the primary activities element of section 186.22. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465–1466.) In cases where courts have found insufficient evidence of the primary activities element of the criminal street gang definition, for example, there was only testimony of a few shootings over less than a week and one assault six years earlier (*People v. Perez* (2004) 118 Cal.App.4th 151, 160) or no expert testimony on the subject and proof of only one enumerated offense (*In re Jorge G.* (2004) 117 Cal.App.4th 931, 945).

Here, by contrast, the jury heard expert testimony from a longtime gang detective from the Santa Cruz Police Department, Detective Martin, about the West Side Santa Cruz criminal street gang, the only Norteño gang operating in Santa Cruz. Martin's testimony demonstrated his familiarity with the gang, its members, and its territorial rivals. Martin testified that the gang's primary activities are assaults with deadly weapons, carrying concealed firearms, burglaries, and drug sales. Through Martin's

expert testimony, the jury heard that a member of West Side Santa Cruz acknowledge that members of West Side Santa Cruz commit robberies and assaults on their gang rivals. In addition, the jury was entitled to consider the facts of the charged offenses in examining whether the prosecution had proven beyond a reasonable doubt that Namauu and Thomas had actively participated in a criminal street gang. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323.) On this record, we cannot conclude that it clearly appears "that upon no hypothesis whatever is there sufficient evidence to support" Namauu and Thomas's convictions of section 186.22, subdivision (a). (See *Rehmeyer*, *supra*, 19 Cal.App.4th at p. 1765.) We therefore reject their insufficient evidence challenge to their convictions.

I. *Remand Under Senate Bill No. 1393*

The trial court found Namauu's prior serious felony allegation (§ 667, subd. (a)(1)) true and imposed, in consequence, a five-year consecutive term. The trial court sentenced Namauu on August 7, 2018. Senate Bill No. 1393, effective January 1, 2019, amended section 1385 to give trial courts the discretion to dismiss prior serious felony conviction enhancements imposed under section 667, subdivision (a). (Stats. 2018, ch. 1013, §§ 1, 2.) The California Supreme Court has held that Senate Bill No. 1393 applies retroactively to defendants, like Namauu, whose sentences were not yet final when it came into effect. (*People v. Stamps* (2020) 9 Cal.5th 685, 699.) We now decide whether a remand to the sentencing court is necessary or if it would be an " 'idle act.' " (*People v. Gamble* (2008) 164 Cal.App.4th 891, 901 (*Gamble*).)

Generally, "when the record shows that the trial court proceeded with sentencing on the [] assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) The rationale for this general rule is that "[d]efendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its

68

discretionary authority cannot exercise its informed discretion." (*Ibid*.) There is an exception to this rule, however, where " 'the record shows that the trial court would not have exercised its discretion even if it believed it could do so,' " in which case, " 'remand would be an idle act and is not required.' " (*Gamble*, *supra*, 164 Cal.App.4th at p. 901.)

A "remand [for resentencing] is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a[n] [] enhancement." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) The salient question is whether the trial court "express[ed] its intent to impose the maximum sentence permitted." (*Id*. at p. 427.) "When such an expression is reflected in the appellate record, a remand would be an idle act because the record contains a clear indication that the court will not exercise its discretion in the defendant's favor." (*Ibid*.) Without a clear indication of the trial court's intent, remand is required. (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110–1111.)

In this case, we have no clear indication how the trial court might have exercised its discretion. The trial court did not sentence Namauu to the maximum sentence—for example, it used its discretion to strike three 25 years-to-life enhancements for the personal discharge of a firearm causing death. On this record, we determine, and the Attorney General concurs, that remand is necessary for the trial court to consider, in its discretion, whether to dismiss the prior serious felony enhancement imposed under section 667, subdivision (a).[40] We express no opinion as to how the trial court should exercise its discretion.

---

[40] Furthermore, as we discussed previously, at Namauu's sentencing the trial court did not state a disposition for the firearm enhancements found true by the jury under section 12022.5, subdivision (a), for counts 1 and 2. (See fn. 7, *ante*.) At Namauu's resentencing, the trial court should state a disposition for these enhancements.

J. *Remand under Senate Bill No. 136*

The trial court imposed and stayed a one-year term on Namauu pursuant to section 667.5, subdivision (b). Senate Bill No. 136 (2019-2020 Reg. Sess.), effective January 1, 2020, amended the prior prison term sentence enhancement under section 667.5, subdivision (b), by limiting its application to prison terms that, unlike Namauu's, were served for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1.) We invited the parties to file supplemental briefing on whether the prior prison terms should be stricken based on Senate Bill No. 136. The parties agree that the amendment applies retroactively to Namauu, and we concur. (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 680–682.) We will therefore order the trial court to strike the section 667.5, subdivision (b), sentence enhancement imposed and stayed upon Namauu.

K. *Fines and Fees*

Namauu, joined by Thomas, contends the trial court erred by failing to hold a hearing on their ability to pay the fines and fees imposed at their sentencings.

### 1. Additional Background

At his sentencing, Thomas objected to the proposed restitution fine of $10,000 based on his inability to pay it and requested the trial court set the restitution fine at the statutory minimum amount of $300. Thomas did not object to the other proposed fees. The trial court overruled Thomas's objection to the restitution fine, finding it "appropriate." The trial court imposed on Thomas a $10,000 restitution fine (§ 1202.4, subd. (b)), a suspended $10,000 parole revocation restitution fine (§ 1202.45), a $180 court facilities fee (Gov. Code, § 70373), and a $240 court operations assessment (§ 1465.8). The trial court also ordered victim restitution.

70

When it sentenced Namauu, the trial court noted it had received Namauu's written objection to the $10,000 restitution fine.[41] Namauu also joined in Thomas's objection to the $10,000 restitution fine. Namauu did not object to the imposition of the other fines and fees. The trial court stated it "respectfully disagree[d]" with Namauu's argument and intended to impose the $10,000 fine. The trial court subsequently imposed on Namauu a $10,000 restitution fine (§ 1202.4, subd. (b)), a suspended $10,000 parole revocation restitution fine (§ 1202.45), a $210 court facilities fee (Gov. Code, § 70373), and a $280 court operations assessment (§ 1465.8). The trial court also ordered victim restitution.

On appeal, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Namauu and Thomas challenge the trial court's imposition of the restitution fine and the other fees without first considering their ability to pay them. Namauu and Thomas argue that imposition of these fees also violates the Eighth Amendment's protections against excessive fines.

2. Analysis

For reasons this court has previously explained, we conclude *Dueñas* was wrongly decided. (See *People v. Adams* (2020) 44 Cal.App.5th 828, 831–832; *People v. Petri* (2020) 45 Cal.App.5th 82, 90–91.) We therefore reject Namauu's and Thomas's contention that their due process rights were violated by the trial court's failure to conduct a hearing on their ability to pay the fines and fees it imposed.

We also reject Namauu's and Thomas's similar argument brought under the Excessive Fines Clause of the Eighth Amendment. " '[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's

---

[41] In an e-mail sent to the trial court prior to sentencing, Namauu's trial counsel stated "Mr. Namauu objects to the $10,000 restitution fine. It results in a tax on the benevolent acts of charity from his family when they send him small sums of money—as they inevitably will over the years. The fine also results in a sentence of labor imposed upon a LWOP term. LWOP plus a life of hard labor is cruel, albeit not unusual in the sentencing schemes California has created over the past thirty years."

offense.' [Citation.] To determine whether a fine is excessive in violation of the Eighth Amendment, we consider: '(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay.' [Citation.] Accordingly, although ability to pay is part of the proportionality analysis, it is not the only factor." (*People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 861 (*Pack-Ramirez*).)

Namauu and Thomas were both convicted of first degree murder with a special circumstance and sentenced to life imprisonment. We cannot conclude on this record that the fines and fees imposed were grossly disproportionate to the gravity of these offenses; moreover, we disagree that the Eighth Amendment requires a formal determination of ability to pay before their imposition. (See *Pack-Ramirez*, *supra*, 56 Cal.App.5th at p. 861.)

## III. DISPOSITION

The judgment against Namauu is reversed. The matter is remanded for resentencing. At Namauu's resentencing, the trial court shall determine whether to strike, under Penal Code section 1385, the Penal Code section 667, subdivision (a) enhancement; shall strike the Penal Code section 667.5, subdivision (b) enhancement; and shall state a disposition for the firearm enhancements found true under section 12022.5, subdivision (a), for counts 1 and 2. The trial court shall prepare amended abstracts of judgment and transmit the amended abstracts of judgment to the Department of Corrections and Rehabilitation. In addition, the trial court shall prepare an amended minute order for July 3, 2018, to correctly reflect the jury's verdicts on counts 1, 2, and 3. In all other respects, Namauu's convictions and sentence are affirmed.

The judgment against Thomas is affirmed.

_____
                              Danner, J.

WE CONCUR:


_____
Greenwood, P.J.


_____
Grover, J.


**H046070**
***People v. Namauu, et al.***

Greenwood, P.J., concurring:

I concur in my colleagues' reasoned analysis of defendants' multiple challenges to the judgment and agree that the judgment should be affirmed.

However, I write separately to clarify that, unlike my colleagues, I continue to be persuaded by the reasoning in *People v. Dueñas* (2019) 30 Cal.App.5th 1157. Under certain circumstances, a trial court violates a defendant's federal constitutional right to due process by imposing fines and fees without first assessing the ability of the defendant to pay them. (See *People v. Santos* (2019) 38 Cal.App.5th 923.) But those circumstances do not exist here, as each defendant will serve an aggregate sentence that includes life without the possibility of parole. Courts have generally accepted that a defendant's ability to pay fines and fees includes the prospect of earning prison wages, and defendants will serve prison terms that make such payment possible. (Penal Code, § 2700; *People v. Aviles* (2019) 39 Cal.App.5th 1077.) Also, the severe consequences resulting from unpaid fines and fees cited by the *Dueñas* court, including the risk of additional incarceration for violations of conditions of probation based on the failure to pay fines and fees, and loss of financial credit, are not applicable here. For these reasons, I conclude that the failure to conduct an ability-to-pay hearing for Namauu did not violate due process.

_____
Greenwood, P.J.

People v. Namauu et al.
No. H046070